[No. S054774. Dec. 24, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH DESMOND TAYLOR, Defendant and Appellant.

854

## COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jay Colangelo, Assistant State Public Defender, Jessica K. McGuire, Ellen J. Eggers and Barry Helft, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Holly Wilkens, Alana Cohen Butler and Annie Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—Keith Desmond Taylor was convicted and sentenced to death for the 1994 murder of Marilyn Mishak, committed in the course of burglarizing Mishak's Redlands home and robbing her. Defendant, who represented himself at trial, contends he was mentally incompetent to conduct his own defense and should not have been permitted to do so. We affirm the judgment.

### Factual and Procedural Background

On the night of September 1, 1994, someone broke into Marilyn Mishak's condominium and stabbed and strangled her to death. Defendant was tied to the burglary and killing primarily by his fingerprints found at the scene and by witnesses who placed him in the vicinity at the time. The jury convicted defendant of first degree murder, robbery and burglary, and found true special circumstance allegations of murder in the commission of burglary and robbery. (Pen. Code, §§ 187, 189, 190.2, 211, 459.) The jury set the penalty for the murder at death, and defendant was so sentenced.

*Guilt Phase Evidence*

On August 31, 1994, defendant stayed with Clemente Calloway at the home of Calloway's grandmother. On September 1, Calloway and defendant went to dinner at a friend's house. They left around 9:00 p.m., and on the way home defendant said he wanted to get a beer. Because no drinking was permitted at his grandmother's, Calloway dropped defendant at a 7-Eleven convenience store a few blocks away, less than a mile from Mishak's condominium. Defendant did not return to Calloway's grandmother's house that night, and Calloway next saw defendant in court.

About 11:30 p.m. on September 1, Kevin Holman, who lived in Mishak's neighborhood, heard tapping on one of his windows. Soon after that, the doorbell rang and Holman answered it to find a young African-American man in dark clothing. The man asked for "Yolanda"[1] and, when told no one by that name lived there, walked away. In a photographic lineup and at trial, Holman identified defendant as the man on his doorstep, though he was not absolutely certain of either identification. About 11:45 p.m., another neighbor, Anne Mills, was awakened by her doorbell ringing. After turning on lights and waiting a few minutes, she looked out the window but saw no one at the door.

Mishak was a developmentally disabled 33-year-old woman who lived alone. Her mother talked to her around 4:00 p.m. on September 1 and went to

---

[1] Calloway later testified defendant had a former girlfriend by this name.

check on her the next day when she did not come to work. She noticed the garage and condominium were uncharacteristically messy; no morning coffee had been made; and a bottle of wine, which Mishak never drank but kept in a cupboard for her father, was on the counter. In the living room, she found Mishak's body lying on the floor, an electrical cord wrapped around her neck.

Police officers called to the scene found the victim lying facedown with the cord around her neck. She was wearing a bloodstained T-shirt, and her underpants were down at her feet. A knife with a three-and-one-half-inch handle, similar to ones in a butcher block in the kitchen, was embedded in the victim's abdomen.

The autopsy showed Mishak had been strangled and stabbed in the abdomen, the knife piercing her liver. Either event could have been fatal. Her body also bore bruises in several areas. The medical examiner opined the stabbing and strangling had probably occurred within a few minutes of each other, as the amount of bleeding and hemorrhaging indicated the victim was alive during each.

Mishak's father testified that after her killing he tested the garage door and found that when its handle was pulled upward from the outside, the motion activated the automatic garage door opener and the door opened fully. Doors from the garage into the laundry room and the dining room bore pry marks and had been propped open. A twisted metal strip and a spatula-like tool, which police found on the garage floor, could have been used to pry open the doors. Also found on the garage floor was a paper bag containing a beer bottle.

In the bedrooms, closets and drawers were open. Mishak's jewelry boxes were sitting on the bed and rug in her bedroom, and the contents of her purse had been emptied onto the floor. The victim's mother later examined the condominium's contents and identified several missing items, including the garage door opener and the victim's wallet, watches and other jewelry.

When a latent fingerprint from the paper bag containing the beer bottle was compared to fingerprints in law enforcement databases, it matched defendant's fingerprint. Defendant's fingerprints were then compared to others taken from the victim's condominium. They matched latent fingerprints on the frame of an exterior door, on the wine bottle found on the kitchen counter, and on one of Mishak's jewelry boxes.

A police detective visited 20 to 25 stores in the vicinity to find any that sold 40-ounce bottles of Magnum Malt Liquor, the type of bottle found in the paper bag on the garage floor, and used No. 8 size bags certified as 50 percent

recycled by Scientific Certification Laboratories, the type of bag found on the garage floor. He found only one match for the combination of bag and beverage: the 7-Eleven store where Calloway left defendant to buy beer on the night of the killing.

Called to the stand by defendant, another of Mishak's neighbors testified that early on the morning of September 2, 1994, she saw a man, whom she described to police as White or Hispanic, walking in the area and carrying a paper bag. Several days later, also in the early morning, she saw the same person from closer up; this time he was wearing a backpack and looked like a teenager.

Defendant also called a clerk at the 7-Eleven store and re-called the principal police investigator, Detective Garcia, in an effort to suggest the crimes may have been committed by Jesse Mason, whom Garcia had learned was also staying at Calloway's grandmother's house at the time. Garcia had shown the clerk a photograph of Jesse Mason as part of a photographic lineup. She recognized one picture in the lineup (which did not include defendant's photograph) as that of a regular customer. Some days later, Garcia interviewed Mason and searched his residence, but eliminated him as a suspect when his fingerprints failed to match any of the latent prints taken from the crime scene.

Finally, defendant extensively examined the forensic specialist who lifted latent fingerprints from the scene, a detective who helped collect evidence at the scene, a clerk in the fingerprint examiner's office, and the supervisor of that office regarding the numbering system used to mark latent prints and other evidence and the procedures the examiner's office followed for logging and tracking prints. His apparent goal was to cast doubt on the identification of his fingerprints at the scene by proving gaps or discrepancies in the collection and comparison procedures.

*Penalty Phase Evidence*

The prosecution presented evidence of three incidents involving defendant. In 1988, defendant had broken into a woman's mobilehome in Lemoore at night; when she awoke and confronted him, he knocked her to the floor with his fist. In 1991, he led an Emeryville police officer on a high-speed chase, ran when his car crashed, lunged at the officer during his arrest and, even after being handcuffed, threatened and kicked at the arresting officers. Finally, in 1994, he rang a doorbell in Alameda at 6:15 a.m. and, when the resident did not answer, broke into the garage by smashing a door. Police had difficulty arresting him, and he was carrying a pistol. The prosecution also presented evidence defendant had previously been convicted of residential burglary and auto theft.

Defendant presented no penalty phase evidence.

ANALYSIS

### I. *Procedures for Determining Competence to Stand Trial*

Defendant contends the procedures by which the trial court found him competent to stand trial were constitutionally deficient in several respects. We find no error in the procedures employed.

The question of competence to stand trial was first raised in pretrial proceedings, after defendant's first request to represent himself was denied.[2] In explaining its finding that defendant was not competent to represent himself, the trial court (Judge McCarville) observed: "[W]hile the record, the written record, may reflect [defendant] has given articulate responses [to the court's questions regarding self-representation,] the court will note by his own facial expressions and by certain time delays from the time questions were posed by the court and his responses, and what I will call quizzical looks on his face, while he appeared to give intelligent responses, the court finds that it is not, in fact, the case."

Defense counsel then made "a 1368 motion based on some of the court's comments."[3] The trial court responded that its comments had been aimed only at the question of self-representation, but because counsel sought a determination of trial competence, the court suspended the criminal proceedings and ordered the appointment of two psychologists to examine defendant.

On the form letter of appointment, the court clerk correctly informed the psychologists they were to examine defendant and report on his "present mental competence pursuant to P.C. 1368." Boxes were checked on the form for that statute and for three subsidiary determinations to be made: "Is the defendant presently able to understand the nature and purpose of the proceedings taken against him?" "Is he presently able to cooperate in a rational manner with counsel in presenting a defense?" and "Is he presently able to prepare and conduct his own defense in a rational manner without counsel?" In addition, although defendant had not entered a plea of not guilty by reason

---

[2] Defendant had numerous pretrial disputes with his appointed attorneys, conflicts that prompted five hearings on defendant's request for appointment of different attorneys and finally led him to request self-representation. These disputes seemed to center on counsel's requests for more time to prepare, on what guilt phase strategy to adopt in light of the fingerprint evidence placing defendant at the scene, and on counsel's preparation for a possible penalty phase despite defendant's insistence on his innocence.

[3] Penal Code section 1368 contains the statutory requirements for a determination of trial competence. All further unspecified statutory references are to the Penal Code.

of insanity, the letter stated the examination was also under "section 1026 of the Penal Code," which sets out the procedures for trying such a plea, and two question boxes relating to insanity were checked: "Was the defendant sane at the time of the commission of the alleged offense?" and "Has the defendant 'fully recovered his sanity' . . . ?"

The appointed psychologists, Michael Kania and Christopher Flach, each examined defendant and submitted a written report. Kania, who interviewed defendant but administered no tests, concentrated his report on competence questions. He found defendant was "able to accurately perceive events occurring around him, with no evidence of significant distortions due to severe psychopathology." Defendant's "cognitive functioning is intact. Attention, concentration and comprehension are good. The defendant appears to be of average intellectual ability. . . . [¶] Diagnostically, the defendant does not appear to suffer from any severe psychological disorder at the present time. There are some features of a personality disorder, and there is also a history of cocaine abuse." Defendant knew the charges against him and the roles played by his attorney, the district attorney, the court and the jury. Kania concluded defendant understood the nature and purpose of the proceedings, was able to cooperate in a rational manner with counsel (though he expressed dissatisfaction with his current attorney), and would be able to conduct his own defense in a rational manner. Defendant was "trial competent."

Flach administered several tests, including two intelligence tests, and also interviewed defendant. He described his appointment as for a "1368 PC evaluation," but also purported to ascertain defendant's mental state "to aid in diagnosis, treatment, and placement planning." He found defendant knew he faced a murder charge and could be sentenced to death, and knew the roles of the prosecutor, the judge and the defense counsel, though he distrusted his current attorney and had difficulty understanding his point of view. Flach found "no acute psychotic thought disorders" from his examination, but found defendant seemed "somewhat grandiose at times," particularly as to courtroom "strategies," and presented with "an exaggerated degree of self-importance" and entitlement, displaying a "rather narcissistic perspective." Defendant had "inflated ideas about his own accomplishments" and an "almost . . . delusional conviction regarding the nature of his insight." He "seems to believe that his needs are special, particularly within the courtroom situation. In part, this may explain his reason for doubting his own attorney or even trying to represent himself." Flach observed these personality traits could be related to defendant's "long history of cocaine dependence."

With regard to intellectual functioning, defendant's test results were in the "borderline range" (including a 75 verbal IQ score on the Wechsler Adult Intelligence Scale—Revised). In general, Flach found defendant's abilities

borderline in understanding of the world, vocabulary and memory, and low average in math skills. Overall defendant had "low average to borderline intelligence, with severe deficits noted in common sense reasoning and abstract thinking abilities." These deficits, which "would [a]ffect his ability to effectively interact with others at times" and to understand abstract problems, were "consistent" with defendant's history of substance abuse. Flach concluded defendant understood the nature and purpose of the proceedings, but "may have difficulty in rationally cooperating with coun[sel], due to his tendency to become somewhat defensive and distrusting." Because of his low average to borderline intellectual functioning, defendant "would have some difficulty in representing himself without an attorney." Addressing the insanity-related questions checked on the form letter of appointment, Flach observed that defendant appeared to be aware of the wrongful conduct he had admitted (breaking into an Oakland garage), but that his thinking at the time may have been affected by substance use, and that defendant had not "fully recovered" his sanity, in that the possibility of drug use made him a continuing danger to himself and others.

After receiving the psychologists' reports, the trial court held a hearing to try the competence issue. Defendant waived his right to a jury trial on the question, and both parties submitted the question to the court without further evidence or argument. The court, "based upon review of the reports," found defendant competent to stand trial and assigned the case to a trial department.

■ Neither the federal Constitution nor our statutes allow a person to be tried criminally while mentally incompetent. (*Pate v. Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 86 S.Ct. 836]; § 1367, subd. (a).) The constitutional test is whether the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him.' " (*Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788] (*per curiam*).) Our statutes similarly forbid prosecution while the defendant, "as a result of mental disorder or developmental disability, . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

The federal Constitution further demands that "state procedures . . . be adequate to protect this right." (*Pate v. Robinson, supra,* 383 U.S. at p. 378; accord, *Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103, 95 S.Ct. 896].) Our statutes provide for suspension of criminal proceedings when a doubt as to the defendant's competence arises in the trial judge's mind or when counsel informs the court of counsel's belief the defendant may be incompetent (§ 1368); the appointment of psychologists or psychiatrists to

examine the defendant (§ 1369, subd. (a)); and trial of the issue to a jury or to the court (*id.*, subds. (b)–(f)). The defense may waive a jury trial and may even, as here, submit the issue to the court on the written reports of psychologists or psychiatrists. (*People v. Lawley* (2002) 27 Cal.4th 102, 131–132 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1169 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Defendant contends the procedures the trial court employed for determining his competence to stand trial were constitutionally inadequate, first, in that the court failed to pose the proper questions for the two psychologists. According to defendant, this resulted in "the failure of one of the experts [Flach] to address the competency question at all." At the least, defendant argues, the resulting flaws in Flach's report required live testimony to be taken at the competence hearing.

The record does not support this contention. The court's form letter of appointment requested evaluation of defendant's "present mental competence pursuant to P.C. 1368," and a series of more specific questions aimed at that issue were checked on the form. That the letter also referred inappropriately to the issue of sanity, and two questions regarding that issue were also checked, does not establish any constitutionally significant error. Similarly, the record shows Flach's report did address the competence questions, though he refrained from giving a definitive opinion on the final issue. That he *also* discussed defendant's mental status more broadly and briefly addressed the checked insanity questions did not render his report ambiguous or misleading. Flach's superfluous conclusions therefore did not require the trial court to hold an evidentiary hearing at which the expert could be cross-examined. Defendant's cited case, *Matheney v. Anderson* (7th Cir. 2001) 253 F.3d 1025, in which counsel requested a competence evaluation but the trial court's examination order and the experts' reports addressed only the sanity question, yet counsel failed to seek a hearing (see *id.* at pp. 1029–1032, 1040–1041), is clearly inapposite.

Second, defendant contends the trial court was constitutionally obliged to hold an evidentiary hearing in order to resolve conflicts between the two psychologists' reports. On this point, we agree with the Attorney General that defendant's characterization of the conflict is exaggerated. Neither psychologist found that defendant suffered from any psychosis or other severe mental illness, and both noted defendant's history of substance abuse, which Flach found might have adversely affected defendant's intellectual functioning and personality. While Kania noted "some features of a personality disorder," Flach's more detailed description of defendant's self-image as "somewhat grandiose" with "an exaggerated degree of self-importance" and a "rather narcissistic perspective" was not inconsistent. Although defendant's intellectual functioning was assessed as average by Kania and as low average or

borderline by Flach, the experts agreed he was capable of understanding the nature of the proceedings against him.

The only significant difference in the experts' conclusions with regard to trial competence was that Kania believed defendant was "able to cooperate in a rational manner with counsel," though he was dissatisfied with his lawyers, while Flach believed that because of defendant's distrustful and defensive tendencies, he might "have difficulty" cooperating rationally with counsel. Flach's conclusion was consistent with the record of proceedings to that point, which showed defendant had indeed had difficulty cooperating with counsel, partly because of distrust arising from differences over defense strategy. (See fn. 2, *ante*.) Notably, however, Flach did not opine that defendant's difficulties with counsel were due to mental illness. Nor did he state a conclusion defendant was *unable* to assist counsel in presentation of a defense or was incompetent to stand trial.[4]

We conclude that as in *People v. Lawley, supra,* 27 Cal.4th at pages 130–132, where a court-appointed psychologist and one hired by the defense had reached different conclusions on the defendant's trial competence, the trial court here could, despite the differences between Kania's and Flach's reports, constitutionally undertake to resolve the competence question without holding an evidentiary hearing.[5] (See also *People v. McPeters, supra,* 2 Cal.4th at pp. 1168–1169 [submission on expert reports not an unconstitutional procedure where, though two current reports found the defendant competent, a past report by one of the experts found him incompetent].) There was no evidence before the trial court of psychosis or any severe thought disorder, and neither expert opined that defendant would be unable to assist counsel because of a mental illness. Defendant clearly had a history of conflict with his attorneys, but the court could reasonably conclude, without

---

[4] Defendant argues Flach found him incompetent by opining that he had not fully recovered his sanity. That conclusion, however, related to insanity under section 1026, not to trial competence, and was in response to the court's inquiry, on the form letter, whether defendant had recovered his sanity in the sense of having "improved to such an extent that he is no longer a danger to the health and safety of others, including himself." Flach opined that because of his distrustfulness and his tendency to drug abuse, defendant "seems to present" as a danger to himself and "quite possibly" to others.

[5] Defendant argues *People v. Lawley, supra,* 27 Cal.4th 102, is inconsistent with the high court's decision in *Ford v. Wainwright* (1986) 477 U.S. 399 [91 L.Ed.2d 335, 106 S.Ct. 2595]. We disagree. *Ford* involved procedures for determining sanity at the time of execution, not competence to stand trial, and the Florida procedure for making that determination was held constitutionally inadequate primarily because it allowed no opportunity for the death row inmate or his counsel to contest the opinions of the state-appointed experts by presenting contrary evidence. (*Id.* at pp. 413–414; see also *id.* at p. 424 (conc. opn. of Powell, J.).) In contrast, California provides a full opportunity for a contested trial on the issue of trial competence, including presentation of evidence by the defense. (§ 1369, subd. (b)(1).) Nothing in *Ford* suggests a statutory right to a hearing on competence cannot constitutionally be waived.

contradiction from either psychologist's report, that such conflicts were attributable to difficult aspects of defendant's personality rather than to a diagnosed mental illness.

Third, defendant contends the trial court was obliged to have him examined by the regional center for the developmentally disabled (see § 1369, subd. (a)) because Flach's testing showed a verbal IQ score of 75. Flach's report, however, nowhere referred to any possibility of a developmental disability. Rather, Flach concluded defendant's relatively low intelligence might be "related to his problems and history with substance dependence," and his difficulty with commonsense reasoning was "consistent with his history of substance abuse." This was not an opinion that would cause the trial court to "suspect[] the defendant is developmentally disabled" (§ 1369, subd. (a)), and no referral was therefore required.

Finally, defendant contends events during the guilt and special circumstances trial and at a hearing between the guilt and penalty phases should have led the trial court to reevaluate his trial competence before proceeding with the penalty trial. We conclude such reexamination was not required.

■ " 'When a competency hearing has already been held and defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding. [Citations.]' " (*People v. Kelly* (1992) 1 Cal.4th 495, 542–543 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Here, there was no such new evidence or changed circumstances. During the guilt phase of trial, to be sure, defendant displayed some of the "deficits . . . in common sense reasoning and abstract thinking abilities" Flach had already noted, engaging in extensive unproductive questioning of witnesses and inarticulate arguments to the court and jury. But defendant points to nothing in his guilt phase efforts indicating he had lost the ability to understand the nature of the criminal proceedings. Defendant's attempts to defend himself at the guilt phase may have been, as he now says, "disturbingly inept," but they were not of a character to cast serious doubt on the trial court's finding that he knew what he was charged with and the nature of the trial in which he took full part. Nor did defendant's mention, at a hearing before the penalty phase began, of the possibility that he might seek a new guilt trial on the basis of his own "incompetence" as an attorney[6] constitute changed circumstances or new evidence that undermined the trial court's original determination he was competent to stand trial.

---

[6] After the guilt phase verdicts were returned, and before the penalty phase trial began, defendant (who was representing himself) complained about the reluctance of a man who had agreed to serve as a paralegal for him to prepare a motion he wanted to file. In an in camera

## II. *Self-representation in Capital Cases*

Defendant contends that in capital cases the Sixth Amendment right to represent oneself, recognized in *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*), must give way to the requirements of the Fifth and Eighth Amendments to the federal Constitution that the death penalty be imposed through a fair and reliable procedure.[7] He maintains the latter principle requires representation by counsel, even contrary to the defendant's choice, in all capital trials or, at a minimum, whenever the self-representing defendant's conduct of his or her trial renders it unfair. Defendant's "inept" conduct of his own defense, he further argues, made his trial fundamentally unfair.

We addressed and rejected much the same set of claims in *People v. Blair* (2005) 36 Cal.4th 686, 736–740 [31 Cal.Rptr.3d 485, 115 P.3d 1145], and other cases. We have explained that the autonomy interest motivating the decision in *Faretta*—the principle that for the state to "force a lawyer on a defendant" would impinge on " 'that respect for the individual which is the lifeblood of the law' " (*Faretta, supra,* 422 U.S. at p. 834)—applies at a capital penalty trial as well as in a trial of guilt. (*Blair,* at pp. 738–740.) This is true even when self-representation at the penalty phase permits the defendant to preclude any investigation and presentation of mitigating evidence. (*Id.* at p. 737; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1073–1074 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1364–1365 [65 Cal.Rptr.2d 145, 939 P.2d 259].) A defendant convicted of a capital crime may legitimately choose a strategy aimed at obtaining a sentence of death rather than one of life imprisonment without the possibility of parole, for some individuals may rationally prefer the former to the latter. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1222–1223 [259 Cal.Rptr. 669, 774 P.2d 698].) Moreover, a rule requiring reversal when a capital defendant chooses self-representation and presents no mitigating evidence could easily be misused by a knowledgeable defendant who wished to embed his trial with reversible error. (*Id.* at pp. 1227–1228.)

hearing, defendant characterized the motion as one concerning his own "competence," and he answered affirmatively when the court asked if he meant competence to stand trial. On further discussion, however, defendant clarified he sought not to determine his mental competence to proceed with the penalty phase trial, but rather, sought to obtain a "retrial" of the guilt phase on the ground that he had been "incompetent" in representing himself. Standby counsel, who had discussed the question with the paralegal, explained that the proposed motion was one for a new trial on grounds of "ineffectiveness of his [defendant's] own counsel." The court told defendant such a claim would probably not be persuasive but that he could raise it on appeal or perhaps after the penalty phase.

[7] In order to preserve the claim for potential federal court review, defendant also contends *Faretta, supra,* 422 U.S. 806, was wrongly decided and should be overruled. Because, as defendant recognizes, this court cannot overrule a decision of the United States Supreme Court, we do not address his attack on *Faretta*.

Nor does the likelihood or actuality of a poor performance by a defendant acting in propria persona defeat the federal self-representation right. The *Faretta* court explicitly recognized the probability defendants will be ill-served by waiving counsel and relying on their own "unskilled efforts," but nonetheless held the defendant's choice "must be honored." (*Faretta, supra,* 422 U.S. at p. 834.) "The high court, however, has adhered to the principles of *Faretta* even with the understanding that self-representation more often than not results in detriment to the defendant, if not outright unfairness. [Citations.] Under these circumstances, we are not free to hold that the government's interest in ensuring the fairness and integrity of defendant's trial outweighed defendant's right to self-representation." (*People v. Blair, supra,* 36 Cal.4th at pp. 739–740, fn. omitted.)

We conclude, therefore, that neither the fact defendant faced the death penalty nor the asserted ineptness of his defense efforts warranted denying or revoking his in propria persona status. We address in the next part the more difficult question of whether self-representation should have been denied or revoked on the ground defendant was mentally incompetent to represent himself.

### III. *Defendant's Mental Competence to Represent Himself*

In its recent decision in *Indiana v. Edwards* (2008) 554 U.S. 164 [171 L.Ed.2d 345, 128 S.Ct. 2379] (*Edwards*), the United States Supreme Court held the federal Constitution does not prohibit state courts from denying self-representation to defendants who are competent to stand trial with an attorney, i.e., are trial competent, but who lack the mental health or capacity to conduct their own defense at trial. (See *id.* at pp. ___–___, ___ [128 S.Ct. at pp. 2385–2386, 2388].) Relying principally on this decision, defendant contends he was incompetent to represent himself, and the trial court, acting under the mistaken belief his request to represent himself could not be denied once he had been found trial competent, erred in failing to exercise its discretion to deny self-representation on grounds of mental incompetence.

■ After setting out the record facts relevant to defendant's claim he should have been denied self-representation on grounds of mental incompetence, we review the history of the competence question in federal and California courts. For reasons we explain, we conclude the trial court did not err in granting defendant's request to represent himself. While *Edwards* makes clear states may set a higher or different competence standard for self-representation than for trial with counsel, California had not done so at the time of defendant's trial. In the absence of a separate California test of mental competence for self-representation, the trial court had no higher or

different standard to apply to the question. In that circumstance, the court did not err in relying on federal and state case law equating competence for self-representation with competence to stand trial.

### A. *Facts Relevant to the Issue*

We review the procedural facts surrounding defendant's self-representation and the aspects of his behavior at trial on which he now relies to show the trial court should have found him mentally incompetent to present his own defense.

### *Pretrial Procedure*

As we have already noted, defendant had pretrial disagreements with his appointed attorneys, which led to several motions to substitute counsel, one of which, in February 1995, was granted. On January 5, 1996, defendant complained, as he had of his previous lawyers, that new counsel and he did not "see eye to eye" on strategy. Pressed to be more specific, defendant responded only that "I don't agree with" counsel, that it was nothing personal, but "I don't feel he's presenting a good enough defense for me." Denying the request for cocounsel status or new counsel, the trial court considered defendant's alternative request for self-representation.

The court (Judge McCarville) examined defendant on his understanding of the disadvantages and obstacles he would face representing himself. In answer to the court's questions, defendant said he had a high school diploma and could read and write. When the court explained that the prosecutor would not be lenient if defendant represented himself, defendant responded: "He's not supposed to. He's my enemy." Asked what legal training he had, if any, defendant answered: "I think I can think and reason logically, common sense. So I'd use my best judgment when I defend myself." Asked why he wanted to represent himself, he replied: "I feel that I'll do a good job and I'm not about playing games."

The court denied defendant's *Faretta* motion on the ground he "does not have the ability to proceed pro per as his own counsel in this case." In denying the motion the court made comments that prompted counsel to seek a competence examination. The court stated that while some of defendant's responses in the colloquy appeared "articulate" and "intelligent," defendant's "quizzical looks" and delays in answering suggested otherwise. Based on its observations and defendant's responses, the court had "very serious doubts that Mr. Taylor has even any part of an ability to represent himself in this particular case in a way that would comport with due process and justice."

As noted in part I, *ante*, the psychologists subsequently appointed to examine defendant regarding his competence to stand trial were also asked

whether he was "presently able to prepare and conduct his own defense in a rational manner without counsel." Kania, who found defendant's "cognitive functioning is intact" and defendant to be of "average intellectual ability," opined defendant "would be able to conduct his own defense in a rational manner." Flach, who found defendant was of "low average to borderline intelligence, with severe deficits noted in common sense reasoning and abstract thinking abilities," opined defendant "would have some difficulty in representing himself without an attorney."

On February 5, 1996, after the court found defendant competent to stand trial, defendant renewed his January 5 self-representation request, but Judge McCarville stated he had already addressed that issue and transferred the case to Judge Edwards's department for trial. Later the same day, before Judge Edwards, defendant again asked to represent himself. The court noted Judge McCarville had just denied that motion and advised defendant the court would reconsider it only if there were a change of circumstances. But on February 26, 1996, at the outset of jury selection, defendant again renewed his request and the court scheduled a hearing on it for the next day.

On February 27, the court extensively described to defendant the difficulties and risks of attempting to defend himself in a capital case. Defendant said he "underst[ood] clearly" and had no questions. Asked why he wanted to represent himself, he said, of his attorneys, that "there are things they haven't done" and "we've been having a conflict verbally." Defendant stated he would like to have advisory counsel, but wished to represent himself even if advisory counsel was not appointed.

The court noted: "I think, as I understand the law, Mr. Taylor has been found competent to stand trial, and that is the test that the court must follow in deciding whether he is competent to waive counsel." Having also reviewed the transcript of defendant's previous *Faretta* hearing before Judge McCarville, the court found defendant was "knowingly, intelligently, and voluntarily" waiving counsel, and on that basis granted the motion for self-representation. Attorney Stephen Levine, who had previously represented defendant, was appointed advisory counsel.

### Trial

As discussed in part IV, *post*, during jury selection defendant, for reasons unclear from the record, declined the court's invitation to challenge for cause a juror who indicated on his questionnaire that the death penalty should be automatic for anyone who commits premeditated murder with special circumstances. On the other hand, defendant successfully challenged one prospective juror for cause and exercised a peremptory challenge against another whom he had unsuccessfully challenged for cause.

At the guilt phase of trial, defendant questioned witnesses extensively on the details of the police investigation. For example, defendant questioned the San Bernardino County forensic specialist who collected most of the crime scene evidence, Valerie Seleska, at great length about the system she used to mark and record that evidence. Much of the questioning focused on the difference between numerals printed on the placards Seleska had placed at the crime scene and the property tag numbers she had used to mark the bagged evidence items themselves. Although Seleska explained early in defendant's initial cross-examination of her that the placards were used only as references for locations at the crime scene and not to designate items of evidence collected, defendant called her in his own case and continued to ask about the differing numbering systems (as well as about separate tags added by the Redlands Police Department). Later, he called her to the stand again and examined her at length on how and when she had marked and transmitted to the fingerprint examiner each of the latent prints she collected or photographed at the scene or from evidence collected there. These questions were apparently aimed at showing Seleska might have fabricated some aspect of her records: defendant asked argumentatively how he could tell Seleska had not duplicated and falsely dated a fingerprint card, and whether, if she "wanted to make [her] statement accurate, or say some truth into [it]," would she not want each print "to be documented so there wouldn't be no dispute about whether [she] did it on" a particular date.

Another area of repeated focus for defendant was the procedure used by the fingerprint examiner's office to receive and record prints for comparison. Seleska first brought prints in this case to the San Bernardino County Sheriff's Department examination office on a holiday, when the clerk who would ordinarily have logged them in, Mary Batt, was not working; Seleska therefore took them directly to an examiner who was on duty, Gene Bragdon; she did so with other prints on later days as well. As a result, many of the prints Bragdon examined were not accompanied by a work order or envelope showing the date and time his office had received them. Defendant questioned Seleska, Batt and Bragdon on several occasions about the ordinary procedure for logging prints into the examiner's office and the procedure used with regard to prints in this case. He also questioned Bragdon in detail on the process by which one of the latent prints from the scene was initially matched to defendant through a computer database search. The two topics were, to defendant's mind, closely related; he asked Bragdon, "How can I verify that you submitted a print and not had just went into the computer and selected people at random" if the time Bragdon received the latent print from Seleska was not documented.

Part of defendant's theory, he explained outside the jury's presence, was that from the many latent fingerprints obtained at the crime scene, Bragdon must have found database matches to others as well as to defendant, and that

the police had not properly investigated the possible guilt of these hypothetical other individuals. To the jury, he argued that the fingerprints collected and compared in the investigation had never been properly documented: "They just floating around. Just float around. We're dealing with my life. Prints floating around. Not stamped. Not logged in no files. From that day they in and out of the courtroom as exhibits. Print on the door frame pop up later."

Generally, in guilt phase jury argument, defendant attempted to tie what he claimed was sloppy or deceptive documentation of the investigation to an inappropriate police focus on him to the exclusion of investigating other suspects, which the police witnesses had attempted to cover up. His defense, he told the jury, "is pretty obvious, that they want me bad, want me convicted 'cause they have no other. Whatever they might believe, they won't admit it." With reference to Bragdon's failure to document when he received prints from Seleska and when he received a match from the computer database search and reported it to the detectives, defendant argued: "Every piece of information that I need or document is just undocumented, unsigned. Every piece of information I need to prove my innocence either is unsigned or is not there. Been denied. Every piece. I wonder why." The police, defendant complained, would not admit that they had had other suspects: "I'm saying he won't admit it, 'cause I believe they started so many lies prior would forbid them to tell the truth. They want to win a case. So, you seen them testify on the stand. Everybody have eyes and they see the testimonies, reactions, the truth on this. If you had a case, you wouldn't be covering up, coercing. You would tell it like it is."

After the jury returned guilty verdicts on the charged offenses and found true the special circumstances, the court asked defendant whether he wished to have counsel reappointed for the penalty phase of trial, and encouraged him to do so. Defendant said he would accept someone other than his former attorney, Levine, who was acting as standby counsel (to which status he had been demoted, at defendant's request, from advisory counsel). Because defendant offered no new reason for rejecting Levine, however, the court stated it would reappoint him unless defendant chose to continue representing himself. Defendant chose the latter course.

Levine then filed a motion to withdraw from his standby position. Levine explained he believed defendant had shown himself unable to conduct his own defense. His "focus on irrelevant matter and procedural manuals" had alienated the jury and, though the reporter's transcript did not reflect it, during examination of witnesses defendant "was unprepared, would stand at the podium for long, long, periods of time (the longest I recall was 22 minutes) without saying a word, shuffling papers, while the court, the prosecutor, and the jury all sat there waiting for him to get his thoughts together."

Levine argued that, at least in capital cases, mere competence to stand trial should not entitle a defendant to represent himself. While acknowledging that the high court in *Godinez v. Moran* (1993) 509 U.S. 389 [125 L.Ed.2d 321, 113 S.Ct. 2680] had held the competence standard for waiving counsel was the same as that for standing trial, and California had not yet adopted any higher standard for self-representation, Levine urged the trial court to take the "courageous" step of doing so itself and finding defendant incompetent to represent himself at the penalty phase. Absent that step, Levine "no longer [felt] that [he could] sit in court" and observe as standby counsel.

Regarding Levine's plea for revoking defendant's self-representation, the court stated: "While I might personally agree with you, Mr. Levine, I wish the law were different, and it probably should be different. As I understand the law, it's not. I have really no choice in the matter, once he has been found to be competent to stand trial, and to waive his right, and has been fully advised and informed of all of the consequences of exercising his right to represent himself, I think I am bound to honor that request." While sympathizing with Levine's frustrations, the court denied his request to withdraw as standby counsel.

Representing himself at the penalty phase trial, defendant put on no mitigating evidence, though he did cross-examine some of the People's witnesses. He declined to make any argument to the jury.

B. *Standard of Mental Competence for Self-representation: California and Federal Law*

Prior to the United States Supreme Court's 1975 decision in *Faretta, supra,* 422 U.S. 806, this court had discussed the criminal defendant's right to self-representation—and the mental competence needed to exercise the right—under the California Constitution. In *People v. Mattson* (1959) 51 Cal.2d 777, 788 [336 P.2d 937], we stated that article I, former section 13 of the California Constitution (now art. I, § 15), together with implementing statutes, "accord the accused not only a right to counsel but also a right to represent himself if he so elects." In *People v. Carter* (1967) 66 Cal.2d 666, 672 [58 Cal.Rptr. 614, 427 P.2d 214], again referring to state law, we observed that "although every defendant in a criminal case has the constitutional right to represent himself if he so elects [citations], before his waiver of counsel may be accepted the trial court is duty bound to determine his competency to represent himself."

In *People v. Sharp* (1972) 7 Cal.3d 448 [103 Cal.Rptr. 233, 499 P.2d 489] (*Sharp*), however, we disapproved these earlier recognitions of a state law right to self-representation. We held neither article I, former section 13 of the

California Constitution nor Penal Code section 686, both of which allowed the defendant to appear and defend "in person and with counsel," thereby conferred a right to represent oneself. (*Sharp*, at pp. 459, 463–464.)[8] At the same time, we instructed trial courts that in exercising their discretion whether to allow self-representation, they should continue to apply the "competency" standards previously set forth. (*Sharp*, at p. 461.) The only case we cited as having set forth such standards, however, actually discussed the standard for determining "whether the defendant is capable of making a knowing and intelligent election" to waive counsel, not for determining competence to actually represent oneself at trial. (*People v. Floyd* (1970) 1 Cal.3d 694, 702–703 [83 Cal.Rptr. 608, 464 P.2d 64].) Before *Faretta*, then, we had referred to self-representation competence, but had not articulated any standard under California law for its assessment.[9]

In recognizing a federal constitutional right to represent oneself, the high court in *Faretta* also did not address the standard of mental competence needed to claim the right. The court made clear, on the one hand, that the defendant's waiver of counsel must be undertaken voluntarily and " 'with eyes open' " to the disadvantages of self-representation (*Faretta, supra,* 422 U.S. at p. 835) and, on the other, that the defendant's "technical legal knowledge" was irrelevant to the exercise of the right (*id.* at p. 836). But except for noting that Faretta himself was "literate, competent, and understanding" (*id.* at p. 835), the court did not explore how a defendant's mental health and capacity related to the newly recognized Sixth Amendment right.

■ In the wake of *Faretta*'s strong constitutional statement, California courts tended to view the federal self-representation right as absolute, assuming a valid waiver of counsel. In *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187], we held that upon the making of a timely *Faretta* motion "a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so,

---

[8] *Sharp* also held there was no right to self-representation under the *federal* Constitution (*Sharp, supra,* 7 Cal.3d at pp. 454–457), a holding that was, of course, overruled in *Faretta, supra,* 422 U.S. at pages 811–812, 836. But *Sharp* remains good law as to the California Constitution and Penal Code. Indeed, our Constitution now makes clear the defendant has the right only to "the assistance of counsel" and "to be personally present with counsel" (Cal. Const., art. I, § 15), and the Penal Code (§ 686.1) now provides that capital defendants "shall be represented in court by counsel at all stages" of trial.

[9] To be sure, the two issues, competence to waive counsel and competence to represent oneself, have sometimes been deemed closely related. In *People v. Powers* (1967) 256 Cal.App.2d 904, 915 [64 Cal.Rptr. 450], for example, the Court of Appeal opined: "A determination of competency to waive counsel must necessarily embrace an assessment of a defendant's ability to conduct his own defense." In *People v. Floyd, supra,* 1 Cal.3d at page 704, this court included the seriousness of the charges and the defendant's youth and limited education as factors against allowing waiver of counsel. To the extent we intended this as a competence standard, however, it could not have survived *Faretta*.

irrespective of how unwise such a choice might appear to be." Two Courts of Appeal went further, expressly deciding there could be, under *Faretta*, no separate standard for mental competence to represent oneself: " '[T]he sole issue to be determined in a *Faretta* hearing is whether the defendant has the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and consequences of his action. Whether or not a defendant is competent to act as his own lawyer is irrelevant.' " (*People v. Zatko* (1978) 80 Cal.App.3d 534, 544 [145 Cal.Rptr. 643], quoting *Curry v. Superior Court* (1977) 75 Cal.App.3d 221, 226–227 [141 Cal.Rptr. 884].)[10]

The Court of Appeal in *People v. Burnett* (1987) 188 Cal.App.3d 1314 [234 Cal.Rptr. 67] (*Burnett*) expressed a contrasting view. Building on the idea expressed in *People v. Powers*, *supra*, 256 Cal.App.2d at page 915, that "[a] determination of competency to waive counsel must necessarily embrace an assessment of a defendant's ability to conduct his own defense," the *Burnett* court opined that "the distinction between competence to waive counsel gauged by whether the accused realizes 'the probable risks and consequences,' and competence measured by the ability to actually represent oneself cannot be fully maintained, for there is a threshold of competence to present a defense below which one cannot genuinely realize the risk of doing so. . . . A defendant who does not appreciate the extent of his own disability cannot be fully aware of the risk of self-representation where the disability significantly impairs his capacity to function in a courtroom." (*Burnett*, at p. 1325.)

The *Burnett* court went on to state a test for the "cognitive and communicative skills" involved in competently representing oneself: "Such skills are present where the accused: (1) possesses a reasonably accurate awareness of his situation, including not simply an appreciation of the charges against him and the range and nature of possible penalties, but also his own physical or mental infirmities, if any; (2) is able to understand and use relevant information rationally in order to fashion a response to the charges; and (3) can coherently communicate that response to the trier of fact." (*Burnett*, *supra*, 188 Cal.App.3d at p. 1327, fn. omitted.) *Burnett* was later followed in *People v. Manago* (1990) 220 Cal.App.3d 982, 988 [269 Cal.Rptr. 819], in the case of a defendant "so undereducated and inarticulate that [his] trial[] would be reduced to a sham and a farce" were he to represent himself.

---

[10] We endorsed this view in *People v. Teron* (1979) 23 Cal.3d 103, 113 [151 Cal.Rptr. 633, 588 P.2d 773], citing *Curry v. Superior Court*, *supra*, 75 Cal.App.3d at page 226, for the proposition that "[i]t is not, however, essential that defendant be competent to serve as counsel in a criminal proceeding . . . ," though a footnote later in our decision suggested that upon hearing evidence that raises a serious question regarding the defendant's "mental capacity" the trial court should suspend proceedings and order a psychiatric examination, presumably with an eye to appointing counsel. (*Teron*, at p. 114, fn. 6.)

The United States Supreme Court's 1993 decision addressing competence, *Godinez v. Moran, supra,* 509 U.S. 389 (*Godinez*), appeared to resolve any dispute by denying the existence of a separate competence standard for self-representation as a matter of federal law. The defendant, Moran, who had tried to kill himself after fatally shooting his former wife and two others, was evaluated by two psychologists and found competent to stand trial. He sought to dismiss his attorneys and plead guilty in order to avoid the presentation of mitigating evidence at his sentencing hearing. Despite Moran's attempted suicide and the fact he was taking prescribed antiseizure medications, the state trial court accepted his waiver of counsel and allowed him to plead guilty; he received a death sentence. (*Id.* at pp. 391–393.) On petition for a writ of habeas corpus, the federal court of appeals held that, even though Moran had been found competent to stand trial, the record showed he was not competent to waive counsel and plead guilty, steps the court of appeals believed required higher levels of mental functioning than standing trial with the assistance of counsel. (*Id.* at p. 394.)

■ The Supreme Court reversed, "reject[ing] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." (*Godinez, supra,* 509 U.S. at p. 398; see *Dusky v. United States, supra,* 362 U.S. 402.) To the argument that representing oneself requires greater intellectual powers than standing trial with an attorney, the high court answered: "But this argument has a flawed premise; the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself." (*Godinez,* at p. 399, fn. omitted.) While most defendants undeniably would be better defended with counsel than without, "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (*Id.* at p. 400, fn. omitted.) The high court acknowledged that in addition to trial competence, the defendant seeking to waive counsel must be found to do so knowingly and voluntarily. The court stressed, however, that this is not a *competence* standard; while the competence inquiry focuses on the defendant's *ability* to understand the proceedings, the "knowing and voluntary" (*ibid.*) inquiry is intended to ensure the defendant actually *does* understand the consequences of his or her decision, and that the decision is uncoerced. (*Id.* at pp. 400–401 & fn. 12.) Finally, the court observed that "psychiatrists and scholars" might find subclassifications of competence useful, and that "while States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the Due Process Clause does not impose these additional requirements." (*Id.* at p. 402.)

Our Courts of Appeal promptly held that under *Godinez* no greater degree of competence was required for self-representation than for standing trial. In *People v. Poplawski* (1994) 25 Cal.App.4th 881, 894–895 [30 Cal.Rptr.2d

760] (*Poplawski*), the court reversed a conviction on the ground the trial court had improperly revoked the defendant's in propria persona status because of the defendant's difficulty understanding and communicating during trial proceedings. *Godinez* established, the court observed, that the only requirements for waiving counsel were trial competence and a voluntary and intelligent waiver. Consequently *Burnett, supra,* 188 Cal.App.3d 1314, and its progeny, decided prior to *Godinez,* were not to be followed "insofar as they purport to impose a stricter standard of competency on the right to undertake one's own defense . . . ." (*Poplawski,* at p. 894.)

Similarly, in *People v. Nauton* (1994) 29 Cal.App.4th 976, 978–979 [34 Cal.Rptr.2d 861] (*Nauton*), the appellate court reversed the conviction because the trial court, despite finding the defendant competent to stand trial, had denied his *Faretta* motion on the ground his "grandiose" thought patterns and "non sequitur responses" made him unsuitable to represent himself. Under *Godinez,* the defendant's ability to represent himself was irrelevant to the competence of his waiver, which was established by his competence to stand trial. (*Nauton,* at pp. 979–980.)

The court in *People v. Hightower* (1996) 41 Cal.App.4th 1108 [49 Cal.Rptr.2d 40] (*Hightower*) followed suit, reversing the conviction of a defendant who was denied self-representation after being found competent to stand trial. Under *Godinez,* the competence standards were the same: "Because the trial court properly found appellant competent to stand trial, it necessarily follows that the trial court erred in denying appellant's motion for self-representation. The two rulings are simply antithetical." (*Hightower,* at p. 1116.) The court noted *Godinez*'s reference to possible adoption of " 'more elaborate' " state law competence standards (*Hightower,* at p. 1113), but held *Burnett*'s proposed standard was not based on California law but on an interpretation of *Faretta* and the high court's earlier decision in *Westbrook v. Arizona* (1966) 384 U.S. 150 [16 L.Ed.2d 429, 86 S.Ct. 1320] (*per curiam*), an interpretation proved wrong in *Godinez* (*Hightower,* at p. 1115). The court observed: "The Attorney General has not cited and our independent research has not led us to a single California case in which a 'California' standard which is different from (or 'more elaborate than') the federal standard for determining competence to waive counsel has been identified." (*Id.* at p. 1115, fn. 4.)

*Poplawski* and *Nauton,* decided in 1994, and *Hightower,* decided January 10, 1996, represented the California appellate courts' most recent statements on the question of competence for self-representation when, on February 27, 1996, the trial court here granted defendant's self-representation motion. Defendant's former attorney, Levine, asking the court to apply a higher competence standard and to revoke defendant's in propria persona status

before the penalty phase (in a motion filed Apr. 23, 1996), acknowledged that *Godinez* equated the standard for representing oneself with that for standing trial, and *Hightower* held California had not yet adopted a higher competence standard for self-representation.

While this court appears not to have addressed the issue between *Godinez* and defendant's trial, we later reached the same conclusion regarding competence as the *Hightower, Nauton* and *Poplawski* courts. In 1997's *People v. Bradford, supra,* 15 Cal.4th at page 1364, we noted *Godinez's* holdings that ability to represent oneself is irrelevant to a competent waiver of counsel and that the competence standard for waiver is the same as to stand trial. In *People v. Welch* (1999) 20 Cal.4th 701, 732–734 [85 Cal.Rptr.2d 203, 976 P.2d 754], we discussed the question more fully, holding that *Burnett* and its progeny, upon which the *Welch* trial court had relied in applying a higher standard of competence and denying a motion for self-representation, were not good law after *Godinez.* In light of *Godinez,* we explained, the trial court had erred in requiring that the defendant "possess some minimal ability to represent himself . . . ." (*Welch,* at p. 734.) More recently, in *People v. Halvorsen* (2007) 42 Cal.4th 379, 432 [64 Cal.Rptr.3d 721, 165 P.3d 512], we held a trial court had erred in denying the defendant's motion to represent himself at a penalty retrial on the ground the defendant "lacked the mental capacity to represent himself . . . ." Under *Godinez,* the *Faretta* right "may be asserted by any defendant competent to stand trial," making the trial court's use of a higher standard erroneous. (*Halvorsen,* at p. 433.)[11]

The federal high court next addressed *Faretta* competence standards, 15 years after *Godinez,* in *Edwards, supra,* 554 U.S. 164 [128 S.Ct. 2379]. Charged in Indiana state court with attempted murder and other crimes, Edwards was twice found incompetent to stand trial because of his schizophrenia and delusions. After his second hospitalization, he was returned to court as competent. The trial court denied his request for self-representation, however, and denied his renewed request when he was retried after a partially hung jury; the court noted his lengthy psychiatric history and found he still suffered from schizophrenia and, while competent to stand trial, was not

---

[11] Courts in several other jurisdictions interpreted *Godinez* similarly to California courts, holding self-representation required no greater or different competence than standing trial with counsel. (See *U.S. v. Hernandez* (9th Cir. 2000) 203 F.3d 614, 620, fn. 8; *State v. Day* (1995) 233 Conn. 813 [661 A.2d 539, 547–548]; *State v. Thornblad* (Minn.Ct.App. 1994) 513 N.W.2d 260, 262–263; *Dunn v. State* (Miss. 1997) 693 So.2d 1333, 1340; *State v. Shafer* (Mo. 1998) 969 S.W.2d 719, 728–729; *State v. Tribble* (2005) 179 Vt. 235 [892 A.2d 232, 240, fn. 2].) Only Wisconsin and the Seventh Circuit Court of Appeals appear to have understood *Godinez* as allowing the state to maintain a higher standard for competence to represent oneself than for competence to stand trial. (See *State v. Klessig* (1997) 211 Wis.2d 194 [564 N.W.2d 716, 723–724]; *Brooks v. McCaughtry* (7th Cir. 2004) 380 F.3d 1009, 1012–1013 [agreeing Wisconsin rule does not violate *Godinez*].)

competent to defend himself. The Indiana appellate courts ordered a new trial on the ground that *Faretta, supra,* 422 U.S. 806, and *Godinez, supra,* 509 U.S. 389, required the state to permit Edwards to represent himself. (*Edwards,* at pp. \_\_\_–\_\_\_ [128 S.Ct. at pp. 2382–2383].)

■ The Supreme Court reversed, holding "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards, supra,* 554 U.S. at p. \_\_\_ [128 S.Ct. at p. 2388].) The court did not overrule *Godinez,* instead distinguishing it on two grounds. First, the defendant in *Godinez* "sought only to change his pleas to guilty, he did not seek to conduct trial proceedings, and his ability to conduct a defense at trial was expressly not at issue." (*Edwards, supra,* 554 U.S. at p. \_\_\_ [128 S.Ct. at p. 2385].) Second, "*Godinez* involved a State that sought to *permit* a gray-area defendant to represent himself. *Godinez*'s constitutional holding is that a State may do so. But that holding simply does not tell a State whether it may *deny* a gray-area defendant the right to represent himself—the matter at issue here." (*Ibid.*)

On the merits of the question, the high court observed that the *Dusky* standard for competence to stand trial *assumes* the defendant will be defending through counsel. The competence case law thus suggests that defending oneself in the absence of an attorney "calls for a different standard." (*Edwards, supra,* 554 U.S. at p. \_\_\_ [128 S.Ct. at p. 2386].) Moreover, "[m]ental illness itself is not a unitary concept. . . . In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." (*Ibid.*)[12] When a defendant who lacks the necessary mental capacity attempts to represent himself, the resulting trial is likely neither to be, nor to appear, fair. "The application of *Dusky*'s basic mental competence standard can help in part to avoid this result. But given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient." (554 U.S. at p. \_\_\_ [128 S.Ct. at p. 2387].)

■ The court in *Edwards* did not hold, contra to *Godinez,* that due process mandates a higher standard of mental competence for self-representation than for trial with counsel. The *Edwards* court held only that

[12] In its recognition of the very different capacities needed to assist defense counsel and to act as one's own counsel, the *Edwards* court echoes the *Godinez* dissent's critique of equating competence to stand trial with competence to represent oneself: "A person who is 'competent' to play basketball is not thereby 'competent' to play the violin." (*Godinez, supra,* 509 U.S. at p. 413 (dis. opn. of Blackmun, J.).)

states *may*, without running afoul of *Faretta*, impose a higher standard, a result at which *Godinez* had hinted by its reference to possibly "more elaborate" state standards. (*Godinez, supra*, 509 U.S. at p. 402.) "In light of *Edwards*, it is clear . . . that we are free to adopt for mentally ill or mentally incapacitated defendants who wish to represent themselves at trial a competency standard that differs from the standard for determining whether such a defendant is competent to stand trial. It is equally clear, however, that *Edwards* does not *mandate* the application of such a dual standard of competency for mentally ill defendants. In other words, *Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent." (*State v. Connor* (2009) 292 Conn. 483 [973 A.2d 627, 650].) *Edwards* thus does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted. In part III.C.2, *post*, we address defendant's further claim that the trial court erred by failing to exercise discretion it assertedly had, under state law, to find him incompetent to represent himself.

### C. *Review of Trial Court's Ruling*

#### 1. *Intelligent Waiver of Counsel*

In briefing filed before the high court's decision in *Edwards, supra*, 554 U.S. 164 [128 S.Ct. 2379], defendant argues that despite Judge Edwards's extensive advice to defendant on the disadvantages of representation and defendant's apparently rational answers to the colloquy, Judge Edwards should have denied defendant's motion to waive counsel on the ground the waiver was not knowing and intelligent. Relying on Judge McCarville's observations in denying the earlier *Faretta* motion and on Psychologist Flach's findings in the competence examination, defendant argues: "Judge Edwards asked all the right questions, but failed to take into account the substantial evidence that [defendant] simply did not comprehend what he was undertaking."

We disagree. In Judge Edwards's colloquy with defendant on February 27, 1996, defendant did not simply reply to the court passively or monosyllabically. When defendant initially requested to "go pro. per. with counsel," for example, the court explained that it would first decide whether to grant the *Faretta* motion and, if it did, only then decide whether to appoint advisory counsel. Defendant said he understood and, a bit later in the discussion, stated that he would like advisory counsel "[b]ut if not, then—I would like to request that, but if not, I would prefer to represent myself." When the court

reiterated that it was not promising to appoint advisory counsel, defendant responded: "Yes, I heard you when you said that." When the court referred to the "great disadvantage" defendant would be under compared to the prosecutor, defendant asked: "What's the disadvantage?" The court elaborated at length, after which defendant acknowledged: "I understand clearly." When defense counsel added to the court's description of the problems of self-representation the difficulty defendant might have deciding whether to introduce mitigation evidence with which he was emotionally involved, defendant responded: "I think I can control that. I understand what you're saying, though." The record clearly shows defendant chose self-representation with his eyes open to the risks and disadvantages it entailed, the nature and seriousness of the charges he faced, and his right to continue being represented by appointed counsel throughout trial. (*People v. Blair, supra,* 36 Cal.4th at p. 708.)[13]

Neither Judge McCarville's earlier remarks nor Flach's report required Judge Edwards to find defendant's choice was not knowing and intelligent. Defendant's "quizzical looks" and delays in answering during the initial colloquy led Judge McCarville to doubt that defendant had the "ability to represent himself," to "proceed pro per as his own counsel." But Judge McCarville indicated no doubt that defendant had understood his advice. Psychologist Flach found defendant to have low intelligence and difficulty with abstract thinking; as a consequence, he would experience "some difficulty in representing himself without an attorney." Nothing in Flach's report, however, should have convinced Judge Edwards that, contrary to his own impressions during his lengthy colloquy with defendant, defendant did not understand the contours of his choice to represent himself.

### 2. *Competence to Defend Without Counsel*

In supplemental briefing directed at the effect of *Edwards, supra,* 554 U.S. 164 [128 S.Ct. 2379], defendant contends the trial court, in considering his competence to represent himself, should have exercised its discretion, later recognized in *Edwards,* to apply a higher standard than mere competence to stand trial. Because he was incompetent under the higher standard, defendant argues, the court should have denied his pretrial *Faretta* motion or, at the least, revoked his self-represented status when the issue was raised by standby counsel Levine before the penalty phase. We reject the claim of error because, at the time of defendant's trial, state law provided the trial court with no test of mental competence to apply other than the *Dusky* standard of competence to stand trial (see *Dusky v. United States, supra,* 362 U.S. 402), under which defendant had already been found competent.

---

[13] The above should not be taken as suggesting an intelligent waiver necessarily requires a defendant to do more than answer the court's questions without elaboration.

■ As explained in part III.B, *ante*, at the time defendant sought self-representation, definitive federal case law rejected the idea that "competence to . . . waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard" (*Godinez, supra*, 509 U.S. at p. 398) and held that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation" (*id.* at p. 400, fn. omitted). While *Godinez* also had somewhat cryptically suggested states were free to adopt "more elaborate" nonconstitutional standards if they so desired (*id.* at p. 402), three California Court of Appeal decisions—binding on the trial court under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]—held it was error to apply a higher standard. (*Hightower, supra*, 41 Cal.App.4th at p. 1116; *Nauton, supra*, 29 Cal.App.4th at pp. 979–980; *Poplawski, supra*, 25 Cal.App.4th at p. 894.) One of those, *Hightower*, discussed the *Godinez* dictum but found not "a single California case in which a 'California' standard which is different from (or 'more elaborate than') the federal standard for determining competence to waive counsel has been identified." (*Hightower*, at p. 1115, fn. 4.) The trial court's assessment of the then governing law—that a finding of trial competence dictated a finding of competence to waive counsel and to represent oneself—was accurate.

Defendant argues *Burnett, supra*, 188 Cal.App.3d 1314, and its progeny provided a basis for the trial court to deny his *Faretta* motion on the ground he lacked the mental capacity "to present a rudimentary defense" (*Burnett*, at p. 1323) without assistance of counsel. But we agree with the court in *Hightower, supra*, 41 Cal.App.4th at page 1115, that *Burnett* did not attempt to articulate a distinct California standard of competence for self-representation.

The issues as framed in *Burnett* were whether a trial court should obtain a psychiatric examination before deciding whether a defendant is "competent to waive counsel" and the proper standard for making that determination. (*Burnett, supra*, 188 Cal.App.3d at p. 1317.) Without extensive discussion of the point, the court cited *federal* authority for the proposition that "the standard for determining competence to stand trial is lower than the standard for determining competence to waive counsel . . . ." (*Id.* at p. 1321.) It was this "competence to waive counsel" for which the court then undertook to articulate a standard. (*Id.* at p. 1323.) The court noted that decisions "interpreting *Faretta*" had differed as to whether competence to waive counsel depended to any extent on the ability to actually present a defense (*ibid.*), but found that two decisions of the United States Supreme Court suggested it did

(*id.* at p. 1324).[14] The *Burnett* court, as discussed earlier, then went on to articulate the "basic cognitive and communicative skills" needed to defend oneself and thus, in the court's view, to competently waive counsel. (*Burnett*, at p. 1327.)

Closely read, therefore, *Burnett* is seen to hold only that the *federal* constitutional right to self-representation is limited by the principle that a person without the mental capacity to defend himself is also not *competent to waive counsel.* This was the precise point later addressed in *Godinez*, which, of course, held ability to defend oneself is irrelevant to competence to waive counsel. (*Godinez, supra*, 509 U.S. at p. 400.) *Burnett* thus did not articulate a separate California competence standard and, after *Godinez*, was not good law as to the federal standard. (See *People v. Welch, supra*, 20 Cal.4th at pp. 732–734; *Hightower, supra*, 41 Cal.App.4th at pp. 1113, 1115; *Poplawski, supra*, 25 Cal.App.4th at p. 894.) The trial court thus did not err by following *Hightower* and concluding, in the absence of a different California standard, that the court's finding that defendant was competent to stand trial compelled a further finding he was competent to represent himself.

Defendant further asserts the trial court's remarks in denying standby counsel Levine's request to reappoint counsel at the penalty phase ("While I might personally agree with you, Mr. Levine, I wish the law were different, and it probably should be different. As I understand the law, it's not.") show the court (Judge Edwards) "certainly believed that [defendant] was not competent to represent himself" and would have revoked his in propria persona status had the court known of its authority under *Edwards.* As just explained, the trial court was *correct* that, under binding federal and state authority, it lacked the power to take that step. But we also believe defendant reads too much into Judge Edwards's remarks. The court's expression of "frustration" at defendant's insistence on representing himself and its "wish" the law allowed for denial of defendant's preference was not extraordinary; the exercise of *Faretta* rights is commonly and understandably frustrating to trial courts, especially in capital and other very serious cases, and courts often wish they could deny the exercise of such rights. Nor was it surprising for the court to express sympathy with Attorney Levine's desire to withdraw from the thankless job of standby counsel, even while denying the request. The court did not state or necessarily imply that, if permitted to do so, it would find defendant incompetent to represent himself.

---

[14] The *Burnett* court also quoted *People v. Powers, supra*, 256 Cal.App.2d at page 915, for the proposition that " '[a] determination of competency to waive counsel must necessarily embrace an assessment of a defendant's ability to conduct his own defense' " (*Burnett, supra*, 188 Cal.App.3d at p. 1325). *Powers*, a pre-*Faretta* decision, in turn cited both federal and California decisions. (*Powers*, at pp. 912–915.) But to the extent *Powers* set limits on the California self-representation right, its holding was nullified—long before *Burnett*—by our decision in *Sharp, supra*, 7 Cal.3d at pages 459, 463–464, holding that no such right existed.

## IV. *Failure to Excuse Juror for Bias*

Juror No. 7 indicated on his questionnaire that he favored the death penalty as a deterrent to crime but did not have strong feelings on the subject, did not believe in the principle of "an eye for an eye," needed to know all the circumstances surrounding the case before making a penalty decision, believed all types of evidence about the defendant's background could be relevant to penalty, would not "always vote" for either life or death if the defendant were found guilty of murder with a felony-murder special circumstance, and could see himself imposing either penalty "in the appropriate case." Nevertheless, he answered affirmatively the question whether the death penalty "should be automatic for anyone who intentionally commits murder (not in self defense)," adding his own explanatory note, "premeditated [and] special circumstances."

On individual voir dire, the court repeated its explanation, given earlier before the panel of prospective jurors, that if the jury in the first phase of trial convicted defendant of first degree murder with special circumstances, there would be a second phase in which the jury would hear additional evidence of factors in mitigation and aggravation and would then be asked to weigh those factors. The following exchange with Juror No. 7 ensued:

"Q. [The Court]: Would you be able to do that or are you telling me that the minute you decided that he was guilty of first degree murder with special circumstances you would always vote death?

"A. [Juror No. 7]: I would probably have to vote for the death penalty.

"Q. [The Court]: This is important that we know that, because if what you're saying is that you would vote death at the beginning, then obviously there is no reason to have the second phase of the trial.

"A. [Juror No. 7]: That's right.

"Q. [The Court]: So is that what you're telling me?

"A. [Juror No. 7]: Basically, yes."

After other prospective jurors were questioned, the court entertained challenges for cause from both the prosecutor and defendant. The following exchange occurred:

"The Court: But I guess my first question was [Juror No. 7]. And if I understand his answers correctly, he had indicated that he would automatically vote death, even before we got to the penalty phase of the trial, if he

found you had committed first degree murder with special circumstances. I don't know if you want to exercise a challenge as to him, but that would certainly seem to be an appropriate challenge for cause. I don't know if Mr. Ramos had any comment.

"Mr. Ramos [the prosecutor]: I agree with the court. In fact, I'd stipulate to number 7.

"[Defendant]: Which one? [Juror No. 7], number 7, I would like to keep him. I would like to keep Mr.—

"The Court: I'm sorry?

"[Defendant]: I would like to keep him.

"The Court: You want to keep [Juror No. 7]?

"Mr. Ramos: I'll withdraw my request.

"The Court: Unless I misunderstood him, I thought he said he would automatically vote death if he found you were guilty of first degree murder. You still want to keep him?

"[Defendant]: Yes.

"The Court. Okay."

Defendant did not use a peremptory challenge on Juror No. 7, did not exhaust his peremptory challenges, and accepted the jury as seated.

Defendant contends the trial court committed reversible constitutional error by including in the penalty jury a juror who would vote automatically for the death penalty without considering mitigating evidence and regardless of the court's instructions. (*Wainwright v. Witt* (1985) 469 U.S. 412, 423–424 [83 L.Ed.2d 841 105 S.Ct. 844]; *People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103].) The Attorney General does not address whether the record shows Juror No. 7 was biased, instead arguing the trial court had no sua sponte duty to excuse the juror, and defendant's claim is therefore waived by his failure to challenge Juror No. 7 and exhaust his peremptory challenges or, alternatively, is barred under the doctrine of invited error.

 We agree with the Attorney General that defendant, having chosen not to challenge Juror No. 7 for cause or peremptorily, and having neither

exhausted his peremptory challenges nor expressed dissatisfaction with the jury, cannot raise on appeal the trial court's failure to excuse Juror No. 7. "Under our state law, a defendant who wishes to preserve a claim of error in the improper denial of a challenge for cause must (1) use a peremptory challenge to remove the juror in question; (2) exhaust his or her peremptory challenges or justify the failure to do so; and (3) express dissatisfaction with the jury ultimately selected." (*People v. Blair, supra,* 36 Cal.4th at p. 741; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1290 [82 Cal.Rptr.3d 265, 190 P.3d 616] [dissatisfaction requirement applies to trials conducted after 1994 decision clarified the law]; *People v. Wilson* (2008) 43 Cal.4th 1, 34 [73 Cal.Rptr.3d 620, 178 P.3d 1113] (conc. opn. of Werdegar, J.) [noting ambiguity as to application of justification option].) Here, as the Attorney General argues, defendant failed to challenge the juror for cause or peremptorily; nor did he express dissatisfaction with the jury ultimately seated. Indeed, defendant affirmatively stated he wished to keep Juror No. 7 on the jury. By these choices he waived any claim of error in the juror's retention.

If the trial court had a sua sponte duty to excuse jurors on the basis of disqualification under *Wainwright v. Witt, supra,* 469 U.S. 412, independent of the parties' challenges for cause, we would have to decide whether the court erred in not excusing Juror No. 7 on its own motion. The court, however, had no such duty. (*People v. Bolin* (1998) 18 Cal.4th 297, 315 [75 Cal.Rptr.2d 412, 956 P.2d 374]; accord, *People v. Kipp* (1998) 18 Cal.4th 349, 365 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

Arguing otherwise, defendant cites our statement in *People v. Blair, supra,* 36 Cal.4th at page 742, that "[t]o establish that the erroneous *inclusion* of a juror violated a defendant's right to a fair and impartial jury, the defendant must show either that a biased juror actually sat on the jury that imposed the death sentence, or that the defendant was deprived of a peremptory challenge that he or she would have used to excuse a juror who in the end participated in deciding the case." Here, he argues, he has met this burden because the trial court's questioning of Juror No. 7 shows he was actually biased in that he had prejudged the question of penalty. The quoted passage from *Blair,* however, addressed the *merits* of the defendant's claim, this court having determined in the immediately preceding passage that the claim had been properly preserved; the passage does not speak to whether a defendant has preserved or waived a bias claim. (*Id.* at pp. 741–742.)

Defendant points out that in none of this court's decisions holding a juror bias claim had not been preserved did the trial court make an express finding of bias, as defendant contends the court did here, yet retain the juror. But the trial court's remarks here did not amount to a finding of actual bias. Rather, the court observed that on the basis of Juror No. 7's questionnaire and voir

dire responses a challenge for cause would be "appropriate." This remark suggests that at that point—absent any further attempts to rehabilitate the juror—the court was inclined to grant such a challenge, if it were made. But the court did not rule out further questioning of Juror No. 7, which in light of his other questionnaire responses might well have rehabilitated him sufficiently.[15]

Under these circumstances, even where the defendant represented himself, we adhere to the well-established rule that to preserve a claim a biased juror was improperly permitted to serve, the defense must exhaust its peremptory challenges and object to the jury as sworn. (*People v. Blair, supra*, 36 Cal.4th at p. 741.) Because of this conclusion, we need not reach the question of invited error.

### V. *Discriminatory Use of Peremptory Challenges*

■ Defendant contends the prosecutor used his peremptory challenges to excuse four prospective jurors because they were African-American, in violation of defendant's state and federal constitutional rights. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], overruled in part by *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410]; *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].) " 'In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

■ "The *Batson* three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing

---

[15] On the questionnaire, Juror No. 7 stated he needed to know all the circumstances surrounding the case before making a penalty decision and would not "always vote" for either life or death if the defendant were found guilty of murder with a felony-murder special circumstance. In addition, he qualified the response to his answer about automatically imposing the death penalty for intentional murder with a handwritten note that the murder must be "premeditated." But the first degree murder allegation here was tried purely on a felony-murder theory, not one of premeditated and deliberate murder (of which there was little or no evidence). The jury was not instructed on premeditation. Even if taken at face value, therefore, Juror No. 7's statement that he would impose the death penalty for an intentional, premeditated murder with special circumstances did not necessarily show he had actually prejudged the penalty decision in this case, and we do not interpret the trial court's remark as a finding he had.

that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. (*Rice v. Collins* (2006) 546 U.S. 333, 338 [163 L.Ed.2d 824, 126 S.Ct. 969].) The three-step procedure also applies to state constitutional claims. (*People v. Bonilla* [(2007)] 41 Cal.4th [313,] 341 [60 Cal.Rptr.3d 209, 160 P.3d 84]; *People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].)" (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 [80 Cal.Rptr.3d 98, 187 P.3d 946].)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (*Miller-El*[ *v. Cockrell* (2003)] 537 U.S. [322,] 339 [154 L.Ed.2d 931, 123 S.Ct. 1029].) In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. (See *Wheeler, supra*, 22 Cal.3d at p. 281.)" (*People v. Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. (*People v. Bonilla, supra*, 41 Cal.4th at pp. 341–342.) '. . . We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].)" (*People v. Lenix, supra*, 44 Cal.4th at pp. 613–614, fn. omitted.)

After the prosecutor used peremptory challenges to excuse four of the five African-American prospective jurors examined to that point, defendant, who is also African-American, made a "*Wheeler* motion." The trial court found a prima facie case of discriminatory challenges and asked the prosecutor to explain why he had excused the four prospective jurors. In response, the prosecutor addressed each of the four challenges—C.C., V.H., G.S. and T.J.—individually. The prosecutor also noted he had so far used 12 peremptories in total and did not intend to challenge the remaining African-American juror,

Juror No. 2.[16] The trial court sought clarification on one point and gave defendant an opportunity to address the prosecutor's explanation. Discussing the challenges individually, the court concluded the prosecutor had sufficient nondiscriminatory reasons for each, though the challenge to C.C. was close. The court concluded: "I can't say that they come to the point that he is purposely excluding Blacks. So, at this time I will deny the motion."

■■■ We discuss each of the four challenges individually. As part of our analysis, we consider as "bearing on the trial court's factual finding regarding discriminatory intent" (*People v. Lenix, supra,* 44 Cal.4th at p. 607) the comparisons of prospective jurors challenged and unchallenged that defendant expounds in his briefs, though few if any of these comparisons were made in the trial court. At the same time, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." (*Id.* at p. 622.) In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Id.* at p. 624.)

*Challenge to Prospective Juror C.C.*

At the time of trial, C.C. was 47 years old, married with three children, and worked as a motor sweeper operator for the City of Los Angeles. He had served in the Marine Corps and held a bachelor's degree in sociology. According to his questionnaire answers, he had no opinions about the American jury system and did not know what should be done about violent crime. His general feelings about the death penalty were only "in support of the law" and that he "support[ed] whatever the law states." Asked whether he believed in "an eye for an eye and a tooth for a tooth" he checked both "yes" and "no" and added, "whatever the law stipulates." He believed the death penalty may be appropriate "when the law makes it appropriate" and not appropriate "when the law so stipulates." Although he thought all the circumstances surrounding a case should be considered in deciding penalty, he indicated he believed all aspects of the defendant's background should not be considered, explaining, in answer to question No. 76 of the questionnaire, that "the only thing that's important is the letter of the law." Regarding any potential conflict between religious views and the law, he said he would

---

[16] The parties agree that in addition to Juror No. 2, one other African-American, Juror No. 12, ultimately was sworn as a juror.

follow the law because "this is a nation of laws and we should be bound by laws." On question No. 84, he indicated he did not think the death penalty should be automatic for an intentional murder because "I would need to know what the law stipulates."[17]

Questioned by the court about his answer to question No. 76, C.C. agreed that he could follow instructions to consider the defendant's background in weighing factors in aggravation and mitigation in a penalty phase trial. When the prosecutor asked him to explain questionnaire answers the prosecutor characterized as "noncommittal and whatever's the law," C.C. responded: "Whatever the instructions are, whatever the law is. I'm not thoroughly familiar with the whole concept."

Responding to the court's request, in the *Wheeler/Batson* hearing, for his reasons for excusing C.C., the prosecutor said: "Mr. [C.], it was my feeling was very noncommittal in his, not only his questionnaire, but some of the questions that were asked. When I was talking to other jurors, I noticed Mr. [C.] was looking away like he did not want to be here in this courtroom. And the questionnaire under the death penalty was, again, noncommittal. Whatever is the law. Did not say he could go for the death penalty or for life, and that's the reason I excused Mr. [C.]." Later, when the court asked him to clarify what he meant by noncommittal, a term he had used about T.J. as well, the prosecutor added: "Noncommittal. Unequivocal [*sic*] in their answers. They're neither for the death penalty nor against it. They were very vague in their answers in the questionnaire. They, they wouldn't give an indication either way whether they would automatically or even strongly favor either life or death." At another point in the hearing, the prosecutor itemized several questionnaire answers in which C.C. stated simply that he would follow "the law" and added: "And that was his attitude at one point, almost turning his head and closing his eyes during jury selection, and that is the reason, not race, that I felt he should be excused."

The court stated C.C. was a "close one, but if I understand [the prosecutor's] reasons, he felt that he was noncommittal." The court agreed with defendant that such lack of commitment was not grounds for disqualification, but found the prosecutor "was looking for somebody who had a stronger view regarding the death penalty or regarding their ability to impose the · death penalty."

Defendant argues that as a "middle-aged, family man, a former combat Marine, with an obviously very conservative, law-and-order philosophy," C.C. was a desirable juror from the prosecution's point of view and the

---

[17] Question No. 84 asked: "Do you think that the death penalty should be automatic for anyone who intentionally commits murder (not in self-defense)?" .

choice to excuse him could only have been based upon race. But while C.C. repeatedly stated he would follow the law, his responses do not necessarily indicate a proprosecution inclination. He did not have an opinion about solving the problem of violent crime and did not believe in retribution ("an eye for an eye") except to the extent the law "stipulated" it. He had no strong feelings for or against the death penalty generally, and he neither favored nor opposed the death penalty for a person convicted of first degree murder in the course of a residential burglary and robbery. The prosecutor's description of C.C. as noncommittal, rather than as a clear prosecution juror, accords with the record.

Defendant points out that two jurors accepted by the prosecutor to sit in this case, both White, also indicated on the questionnaire or in voir dire that they would follow the law. But neither of these retained jurors clung so persistently to this answer as C.C. did. In answer to question No. 63 (strength of feelings about the death penalty), Juror No. 3 said it should be used only "where circumstances indicate as determined by [the] judicial system," but he gave detailed, well-thought-out answers on questions Nos. 60 and 61 (feelings about the death penalty and reasons for so feeling) and question No. 64 (regarding "an eye for an eye"), all of which C.C. responded to with terse statements that he supported the law and believed whatever it provided. In answer to questions Nos. 73 and 74, Juror No. 7 stated the death penalty was appropriate only "as prescribed by the law," but on question No. 60 he said he "favored the death penalty as a deterrent to crime" (where C.C. responded only that his feelings were "in support of the law"), and on question No. 84 he said the death penalty should be automatic for certain specified kinds of murder (where C.C. responded only that he would need to know "what the law stipulates").[18]

Finally, defendant observes that some jurors the prosecutor accepted gave answers suggesting reservations about imposing the death penalty. But the prosecutor's stated reason for challenging C.C. was not that he insufficiently favored the death penalty; rather, it was that he resisted expressing a view on *either* possible penalty: he "[d]id not say he could go for the death penalty *or* for life," was "*neither* for the death penalty *nor* against it," was "very vague in [his] answers," and "wouldn't give an indication *either way* whether they would automatically or even strongly favor either life *or* death." (Italics added.) Certainly, impartiality requires that a juror not commit to one penalty or the other before hearing the evidence. But a prosecutor might plausibly fear that a prospective juror who articulates *no* personal views and

---

[18] As discussed in part IV, *ante*, the prosecutor initially offered to stipulate to Juror No. 7's excusal for cause, based on his response to question No. 84 and oral followup, but withdrew the offer when defendant opposed excusing the juror.

insists his role will be merely to follow the law will be unprepared and perhaps unable to make the difficult normative decision required of a California penalty juror.

The trial court did not abuse its discretion in finding the prosecutor peremptorily challenged C.C. not because of his race, but because the prosecutor "was looking for somebody who had a stronger view regarding the death penalty or regarding their ability to impose the death penalty."

### Challenge to Prospective Juror V.H.

V.H., 34 years old at the time of trial and married with three children, was a high school graduate and worked as a civilian warehouse worker for the United States Marine Corps. Her brother was awaiting trial on a robbery charge. Regarding the solution to the violent crime problem, she wrote: "We need to seek God!" Her hobbies and interests were "softball, and doing anything and everything I can do to please God!" Asked whether she held religious or moral feelings that might interfere in judging another, she did not check "yes" or "no," but wrote: "I believe that God will do the judging in the end. But I also believe that everyone should have a fair treatment." Her general feeling about the death penalty was that she would "pray and believe that the Lord would direct me in the right way"; her feelings were tied to the biblical admonitions "thou shalt not kill" and "vengeance is mine, saith the Lord." Regarding whether her feelings about the death penalty were strong, she wrote: "Well I just believe in the word of God and I know that it's true." She felt obliged to accept her religious organization's views, but did not think they were in conflict with the law. On question No. 84 (automatic death penalty for intentional murder) she "would have to pray strongly on this matter," though "without prayer my answer would have to be yes."

On voir dire, V.H. reiterated that she held strong religious beliefs and that she would seek guidance from her faith as well as from the court in making a decision. On further questioning by the court, she affirmed that she could set aside her religious views and make a decision based on the evidence and the law if so instructed. In response to a similar question from the prosecutor, however, she answered: "To be honest with you, I really don't want to decide anybody's life or death." The court denied the prosecutor's challenge for cause, immediately after which the prosecutor excused V.H. by peremptory challenge.

At the *Wheeler/Batson* hearing, the prosecutor noted he had unsuccessfully challenged V.H. for cause and explained that while she had said she could be fair and listen to the evidence, "she told me honestly that she could not judge a person, and could not judge a person whether to give them life or death.

She has a brother awaiting trial for a robbery. She indicated she would like to be present for that trial. She had very strong religious beliefs, which I felt after reading her questionnaire and talking to her would get in the way of her ability to be a juror and conduct herself as a juror should in a death penalty case."

Ruling on the motion, the court found, with respect to V.H.: "I had noted from her answers in the questionnaire that she is an extremely religious person to the point where she may not be able to come to a decision based on the evidence and the law. And may, in fact, seek divine guidance. And although her answers to this Court's questions and to counsel's questions technically avoided a challenge for cause, I think there is certainly sufficient reason based on factors other than race to challenge her in the exercise of a peremptory challenge."

██ Defendant faults the trial court for not assessing and considering the prosecutor's second reason for excusing V.H., that she wanted to attend her brother's upcoming trial. Defendant observes that while the prosecutor's *questions* to V.H. suggested she would have trouble serving and also attending her brother's trial, her *answers* suggested the opposite: she did not know when his case would come to trial and was not planning to attend every day in any event. Defendant argues the prosecutor's "fabrication" of a problem suggests his given reasons were pretextual. But the record does not necessarily establish "fabrication." The juror did say that she wanted to attend her brother's trial whenever she could, and regardless of when that trial was scheduled, her interest in it could have raised a concern on the prosecutor's part about her sympathy for the defense or hostility toward the prosecution. Further, the defendant's burden at the third stage of a *Wheeler/Batson* hearing is to show the prosecutor excused prospective jurors for discriminatory reasons (*People v. Lenix, supra,* 44 Cal.4th at pp. 612–613), not merely that some of the nondiscriminatory reasons offered by the prosecutor are not supported by the record. In assessing the prosecutor's credibility, the trial court may, but is not required to, give weight to the fact that he or she has offered some reasons that do not withstand analysis.

Defendant compares the prosecutor's questioning of V.H. with his failure to question a White juror, Juror No. 6, who also indicated he would follow a religious principle in deciding penalty. The two panelists' questionnaire answers, however, are not comparable. Juror No. 6 checked "no" when asked whether he had any religious or moral feeling that would make it difficult for him to judge another and did not explain further. He did not refer to religion in *any* of his responses. To question No. 77 ("What is the view, if any, of your religious organization concerning the death penalty?") he answered: "People since the beginning were put to death for unforgivable crimes." On

question No. 79 ("If this view is in conflict with the law, would you follow the law?") he checked "no." As defendant acknowledges, Juror No. 6's questionnaire responses were generally pro death penalty. That the prosecutor did not see a need to probe Juror No. 6's understanding of his religious organization's views, which clearly would not prevent him from reaching a death verdict, sheds no light on the prosecutor's treatment of V.H.

The trial court did not abuse its discretion in finding the prosecutor exercised a peremptory challenge against Prospective Juror V.H. for the nonracial reason that her religious beliefs might prevent her from reaching verdicts in this case and, especially, from reaching a death verdict.

### Challenge to Prospective Juror G.S.

G.S., 66 years old at the time of trial, was a retired telephone operator with a high school education. She was married with one adult child. Many of her questionnaire answers appeared confused. For example, on question No. 31 she indicated that neither she nor any close friend or relative had been a victim of or a witness to a serious crime, yet she answered the subsequent questions about "the crime," stating "I felt fine" about the police response (question No. 34) and "I feel OK" about the judicial system's response (question No. 35). Asked the view of her religious organization on the death penalty (question No. 77), G.S. answered "None," but asked next whether she felt "obligated to accept this view," she checked "yes." Asked in question No. 81 whether she could ever, in the appropriate case, see herself "rejecting life imprisonment without the possibility of parole and choosing the death penalty instead," she checked "*no*." (Italics added.) Yet on question No. 82, asked for her attitude about the death penalty for someone convicted of first degree murder in the course of a residential robbery and burglary, G.S. checked the two harshest categories, "Automatically vote for the death penalty" and "Strongly favor the death penalty." She also said (on question No. 84) that the death penalty should be "automatic" for anyone who intentionally commits murder. Finally, asked in question No. 85 "what kind of information" would be significant for her in choosing between death and life without parole, she answered simply, "Yes."

In voir dire, the court asked G.S. to say which of six categories printed on placards best reflected her feelings about the death penalty.[19] When she responded, "Oh, dear," the court assured her her answer did not have to be precise and she should say if she was between two categories. She chose

---

[19] The placards are not in the record, but according to a settled statement the categories ranged from group 1: "Will vote for the death penalty in every case of murder with special circumstances" to group 6: "Will vote for life without the possibility of parole in every case of murder with special circumstances."

group 6: "Will vote for life without the possibility of parole in every case of murder with special circumstances." The court asked whether that meant "under no circumstances could you ever vote for the death penalty." G.S. answered: "Oh, yes, if it was proven to be that." G.S. then said she identified with placard group 3 ("Somewhat in favor of the death penalty in some cases of murder with special circumstances") *as well as* group 6. After some additional discussion, she returned to her original answer of group 6, but when the court reminded her that meant she could never impose the death penalty, she answered: "No. No, it says parole in every case of murder with special circumstances. It depends on what the evidence says." The court then abandoned the placard approach and asked G.S. directly whether she would have her mind made up before the penalty phase or would listen to the evidence in that phase of trial and weigh it before making a penalty decision. She answered she would listen to and weigh the evidence.

The prosecutor also questioned G.S. briefly. She reaffirmed her question-naire response that she would automatically vote for death for a person found guilty of murder with special circumstances (question No. 82), adding, "Anybody that's guilty, sure." But she agreed she would be willing to listen to evidence of aggravation and mitigation and "balance both out."

In the *Wheeler/Batson* hearing, the prosecutor explained he excused G.S. because she was "very confused. Had nothing to do with race. In her questionnaire she contradicted herself." On the placards, the prosecutor noted, "she said six, then she changed her mind, and then she went back and said six. I would always choose life without parole." The prosecutor also doubted G.S.'s ability to understand the proceedings and her responsibility as a juror: "I do not believe she was capable of listening to the evidence, weighing the evidence, and applying the law which can become quite complicated . . . ."

The court agreed G.S. "was clearly confused. Her answers were all over the board, so to speak, and there is concern, his concern, that she would be unable to understand and follow the directions of the court, the instructions of the court, I think is a legitimate one, and I made note of that."

The prosecutor's stated reasons are well supported by the record. Whether due to anxiety, limited literacy, poor verbal comprehension or other factors, G.S. displayed great difficulty understanding the written and oral questioning and, in consequence, gave answers that were highly ambiguous, confused and contradictory. Her questionnaire and oral examination gave strong reason to doubt her ability to perform her duties as a juror.

As with Prospective Juror V.H., discussed above, defendant compares the prosecutor's treatment of G.S. with that of Juror No. 6, a White man whom

the prosecutor did not excuse. As noted earlier, Juror No. 6 gave several pro-death-penalty answers on his questionnaire, writing, for example, that in his view if the evidence was sufficient "all convicted murderers should receive the death penalty." Yet, defendant points out, he also said he would *not* always vote for death, regardless of the penalty phase evidence, for a defendant convicted of first degree murder with a felony-murder special circumstance, and he neither favored nor opposed the death penalty in that situation.

There was some tension among Juror No. 6's various questionnaire responses, as was true for many of the prospective jurors. But his questionnaire does not display the same level of confusion and lack of comprehension as G.S.'s. His voir dire, moreover, went much more smoothly. Shown the placards with categories of death penalty attitudes, he chose group 2, "Favors the death penalty but will not vote to impose it in every case of murder with special circumstances," and agreed that best represented his attitude when the court read it aloud to him. While his questionnaire responses raised a question whether he would automatically vote for death and would not consider the penalty phase evidence, the court, by reminding him of the structure of a capital trial and the responsibilities of jurors in such a trial, was able to clarify his attitudes effectively and remove any suggestion of disqualification.

The prosecutor could easily have doubted G.S.'s ability to perform as a juror without harboring the same doubt as to Juror No. 6. As was the case with Prospective Juror V.H., therefore, a comparison with Juror No. 6 does not tend to prove the prosecutor's stated reasons for exercising a peremptory challenge against G.S. were pretextual.

### Challenge to Prospective Juror T.J.

T.J., 26 years old and single at the time of trial, worked as a file clerk for Kaiser Permanente. He had a high school education and had taken some college courses. Asked on the questionnaire about having visited correctional facilities, he wrote: "I've visited a friend @ a correctional facility at least times [*sic*: original spacing]." Regarding the American jury system, he wrote: "I think that those with the most money can afford the best defense. I feel that it would work if we were all on a level playing field." Asked for his "general feelings" about the death penalty, he wrote: "I do feel that the taking of a life is a serious crime, however, I don't have any general feelings about anything." To the next question, which asked for reasons for his feelings, T.J.

wrote that criminal trials are "complicated" and must be viewed "objectively," and that while he "possibly" could judge guilt or innocence, he thought sentencing laws "are motivated by politics and not always reflective of the degree of the crime." His other answers regarding the death penalty consistently stated he would look to all the circumstances of a case and would not preclude either sentence beforehand. Asked whether there was any reason he would prefer not to serve as a juror, he noted that his employer only paid for 30 days of jury duty and that "this trial may last longer" and cause him financial hardship.

In voir dire, the prosecutor assured T.J. the parties did not anticipate the trial taking more than 30 court days, though there might be a one- or two-week break between the guilt and penalty phases. T.J. said that would not create a problem for him. When the prosecutor asked about T.J.'s statement that those with the most money can get the best defense, T.J. explained that this opinion was based in part on the recently concluded O.J. Simpson murder trial but also on other cases, and he noted that defendant was representing himself, which was not very smart. Regarding the political motivation of sentencing, T.J. explained he thought some white collar criminals were given unjustifiably light sentences compared with those who commit violent crimes.

At the *Wheeler/Batson* hearing, the prosecutor explained, first, that he found it "very disturbing" T.J. had visited "friends" in jail or prison but did not say how many times he had done so. The prosecutor continued: "He—we talked about his unpleasant experience with the police. We talked about money affording the best defense. He also indicated under confidentiality that a close friend or relative has been arrested. . . . [H]e was unequivocal [*sic*] about the death penalty. He didn't have any feelings about anything. Talked about the law, and although he may have been indicating appropriate answers when I asked him questions today, his body language, the way he responded, his movement indicated he did not want to serve, as well as his—I can count three times where he's questioned the length of time, the hardship it would create for him and his employment." The prosecutor reiterated that there might be a delay between the two phases of trial, "which may create a problem in these situations."

The court evaluated the challenge to T.J. as follows: "[C]ertainly there was no reason to excuse him for cause, at least what appeared from his answers. But based on his answers, some of his answers in his questionnaire, some of his views about the justice system, I can see a basis for excusing him that is not based on race."

Defendant argues several of the prosecutor's stated reasons for excusing T.J. are contradicted by the record or do not withstand comparison with White jurors the prosecutor retained. But even granting that some parts of the prosecutor's assessment (for example, that T.J. equivocated regarding the death penalty on his questionnaire) are not well supported by the record, the trial court was not required to find the excusal was motivated by T.J.'s race. The reason the trial court accepted for T.J.'s excusal *was* supported by the record: T.J. had written in his questionnaire that sentencing law reflected politics and that a defendant's wealth determined the quality of his defense. On voir dire, he did not retreat from those positions. While T.J.'s critique of the criminal justice system was hardly out of the mainstream, and did not indicate any legal disqualification to serve as a juror, a prosecutor might reasonably prefer jurors who did not hold these views. That the prosecutor excused T.J. on this basis, and not because of his race, was therefore plausible on its face.

As we explained in discussing the challenge to Prospective Juror V.H., a trial court deciding whether to credit the prosecutor's stated reasons may, but is not required to, discount a supportable reason because it is accompanied by unsupportable ones. While an attorney who offers unsupported explanations for excusing a prospective juror may be trying to cover for the fact his or her real motivation is discriminatory, alternatively this may reflect nothing more than a misguided sense that more reasons must be better than fewer or simply a failure of accurate recollection. In the present case, whether by offering a series of nondiscriminatory reasons the prosecutor was trying to obscure his group bias or was simply reading through his notes attempting to articulate what he found unsatisfactory about the prospective juror is impossible to tell from the cold record. The trial court, which could judge tone, gesture and inflection, as well as the words themselves, was in the best position to make this credibility determination. In this situation, we cannot confidently conclude the trial court misjudged the prosecutor and must fall back on the principle that we " 'give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " (*People v. Lenix, supra,* 44 Cal.4th at p. 614.)

### Comparison of Challenges for Cause

Defendant contends the prosecutor's discriminatory motive is circumstantially demonstrated by his differing approaches to challenges for cause.

Prospective Juror D.C., an African-American man, gave several questionnaire answers indicating he would have difficulty considering the sentence of life without possibility of parole for a murder with special circumstances, and he was only partly rehabilitated on voir dire. The prosecutor challenged him

for cause and maintained that position (successfully) even after defendant objected to D.C.'s excusal. Defendant draws a contrast to the prosecutor's later treatment of Juror No. 7 (discussed in pt. IV, *ante*), a White juror who also indicated on one questionnaire question (No. 84) that he would vote automatically for death and who was not rehabilitated on voir dire. The prosecutor initially offered to stipulate to Juror No. 7's excusal (which had been suggested by the court) but withdrew the stipulation when defendant objected to the juror's excusal.

The two men's responses were not, however, as comparable as defendant suggests. D.C. indicated his feelings about the death penalty were very strong and he believed in the saying, "An eye for an eye and a tooth for a tooth"; Juror No. 7 gave the opposite answers to both these questions. On question No. 76, asking whether one should hear "all of the circumstances concerning the defendant and his background" before deciding penalty, D.C. checked "no" and wrote, "As long as you know he or she knows right from wrong and had a choice," while Juror No. 7 checked "yes" and wrote that one "cannot reach a verdict without full knowledge." On question No. 82 (asking which category best reflected the respondent's feelings about the death penalty for "someone convicted of first degree murder in the course of a residential robbery and burglary"), D.C. checked "Automatically vote for the death penalty," while Juror No. 7 checked "Neither favor nor oppose the death penalty." It was primarily on the basis of D.C.'s answer to question No. 82 that the prosecutor argued he should be excused, observing: "Every other person that checked automatic, on number 82, vote for death penalty, we have excused."

We note as well that D.C. was the first death-leaning prospective juror whom defendant (representing himself) argued, seemingly against his own interests, should be retained; Juror No. 7 was the second. Although the prosecutor excused D.C. as one who would automatically vote for the death penalty, by the time Juror No. 7 was considered the prosecutor may have decided not to stand in the way of what appeared to be a strategic error on defendant's part. By offering to stipulate to Juror No. 7's excusal, the prosecutor protected himself and the People from being blamed for any error in the juror's retention, but he may have felt that if defendant was going to *repeatedly* insist on retaining death-leaning jurors, the People need not actively oppose that effort.

Finally, defendant notes the prosecutor stipulated to excusal of an African-American prospective juror with hearing problems, while a White juror who noted some hearing difficulty on her questionnaire was retained. The excused

prospective juror, however, said in voir dire that she had been unable to hear anything defendant (who spoke softly) had said during the proceedings, leading both parties to stipulate to her excusal. Defendant cites nothing in the record indicating the retained juror's hearing difficulty was comparably severe or affected her ability to serve in the same way.

## VI. *Instructions on Aggravating and Mitigating Factors*

Defendant's jury was instructed in the penalty phase with CALJIC No. 8.85, giving the jury the statutory list of possible factors in aggravation and mitigation it could consider (§ 190.3), and with CALJIC No. 8.88, the standard instruction explaining the process of weighing these factors and arriving at the appropriate penalty. Although defendant challenges these instructions on a number of constitutional grounds, we have previously entertained and rejected all of his claims of unconstitutionality, and he does not persuade us to reexamine those decisions.

Factor (a) of section 190.3, which permits the jury to consider the circumstances of the capital crime, does not inject arbitrariness or capriciousness into the penalty decision. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1066 [71 Cal.Rptr.3d 675, 175 P.3d 632]; *People v. Alfaro* (2007) 41 Cal.4th 1277, 1330–1331 [63 Cal.Rptr.3d 433, 163 P.3d 118].) It was, therefore, not constitutional error to so instruct the jury.

The trial court did not constitutionally err in failing to require unanimous jury agreement on defendant's commission of violent crimes considered under factor (b) of section 190.3. Where each juror may rely on such criminal activity as an aggravating factor only if the juror finds defendant's commission of the crime has been proven beyond a reasonable doubt, and the jury must unanimously agree that death is the appropriate penalty, neither the Sixth nor the Eighth Amendment to the federal Constitution requires that the jury also unanimously agree on the application of factor (b) or any other factor in aggravation. (*People v. Brasure, supra,* 42 Cal.4th at pp. 1067–1068; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1181–1182 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].) Similarly, written findings on factors in aggravation are not constitutionally required, even though in noncapital cases the court must state reasons for its sentencing choices; the individual normative character of capital jurors' penalty decisions provides a legitimate basis for the use of procedures

different from those used in noncapital sentencing. (*Brasure*, at p. 1069; *People v. Davis* (2005) 36 Cal.4th 510, 571–572 [31 Cal.Rptr.3d 96, 115 P.3d 417].)

Nor did the court err in failing to delete from its instruction references to assertedly inapplicable factors listed in section 190.3 or to specify which factors may be considered only in mitigation. (*People v. Brasure, supra*, 42 Cal.4th at p. 1069.) The use of the limiting adjectives "extreme" and "substantial" in the instruction on section 190.3, factors (d) and (g) does not unconstitutionally prevent the jury from considering mitigating evidence. (*Brasure*, at p. 1069.)

### VII. *Burden of Proof on Penalty*

Defendant contends our death penalty statute violates the Sixth, Eighth and Fourteenth Amendments to the federal Constitution in failing to require jurors to find beyond a reasonable doubt that aggravating circumstances are proved, that they outweigh the mitigating circumstances, and that death is the appropriate penalty. We have previously rejected these contentions, including those based on *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and its progeny. (*People v. Brasure, supra*, 42 Cal.4th at pp. 1067–1068; *People v. Alfaro, supra*, 41 Cal.4th at p. 1331; *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32 [132 Cal.Rptr.2d 271, 65 P.3d 749].) The trial court also did not err in failing to tell the jury the People bore the burden of proof on penalty or, alternatively, that no burden of proof is applicable. (*Alfaro*, at p. 1331; *People v. Dunkle* (2005) 36 Cal.4th 861, 939 [32 Cal.Rptr.3d 23, 116 P.3d 494].) No instruction on a presumption that the sentence should be life without parole, rather than death, was constitutionally required. (*Brasure*, at p. 1069; *Dunkle*, at p. 940.)

### VIII. *Instruction on Weighing of Aggravation and Mitigation*

Defendant assigns several constitutional flaws to CALJIC No. 8.88's command to jurors that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole," but we have previously rejected his claims in this regard. The instruction's reference to aggravation "substantial[ly]" outweighing mitigation is not impermissibly vague; nor is the instruction misleading in permitting a death verdict when the jurors find that sentence "warrant[ed]." "By advising that a death verdict should be returned only if aggravation is 'so

substantial in comparison with' mitigation that death is 'warranted,' the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty." (*People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980]; accord, *People v. Perry* (2006) 38 Cal.4th 302, 320 [42 Cal.Rptr.3d 30, 132 P.3d 235].) Nor is the instruction deficient in failing to expressly tell jurors they must return a verdict of life without possibility of parole if mitigation outweighs aggravation; that principle is clearly implicit in the standard instruction. (*Perry*, at p. 320.) And, as already noted, the instruction was also not deficient in failing to state that neither party bore the burden of proving whether death was the appropriate penalty. (*People v. Dunkle, supra*, 36 Cal.4th at p. 939.)

## IX. *Intercase Proportionality Review*

Comparative intercase proportionality review of death sentences is not constitutionally required. (*People v. Brasure, supra*, 42 Cal.4th at p. 1068; *People v. Snow, supra*, 30 Cal.4th at p. 126.) Defendant argues federal and state court holdings to this effect should be reevaluated in light of his contentions that the California death penalty statute lacks other constitutionally necessary safeguards against arbitrary imposition. But as noted in parts VI through VIII, *ante*, we have consistently rejected these constitutional claims as well.

## X. *International Law and the Eighth Amendment*

California's use of capital punishment as an authorized sentence for certain specified types of first degree murder does not constitute cruel and unusual punishment merely because most nations have chosen not to employ the death penalty at all. (*People v. Brasure, supra*, 42 Cal.4th at pp. 1071–1072; *People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44 [45 Cal.Rptr.3d 407, 137 P.3d 229].) Nor does our statute violate the International Covenant on Civil and Political Rights. (*Brasure*, at p. 1072; *People v. Turner* (2004) 34 Cal.4th 406, 439–440 [20 Cal.Rptr.3d 182, 99 P.3d 505].)

## XI. *Cumulative Effect of Errors*

Defendant contends that even if none of the errors he has identified was independently prejudicial, their combined effect requires reversal of his conviction and sentence. Having found no unwaived error on the trial court's part, however, we can discern no cumulative prejudice.

## DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied February 18, 2010.