Filed 6/22/16  P. v. Clark CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN JOVAN CLARK,<br><br>    Defendant and Appellant. | B263500<br><br>(Los Angeles County<br>Super. Ct. No. BA398207) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephan A. Marcus, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jonathan Jovan Clark (defendant) contends that the prosecution's peremptory challenges of two African-American prospective jurors were motivated by group bias, and that the trial court improperly overruled his *Wheeler/Batson* objections made on that ground.[1]  Defendant also contends that his sentence enhancement violated principles of double jeopardy.  We find no merit to defendant's contentions, and affirm the judgment.

## BACKGROUND[2]

**Procedural history**

In a three-count information, defendant was charged in count 1 with the murder of Sergio Madrigal, in violation of Penal Code section 187, subdivision (a),[3] and in counts 2 and 3, with second degree robbery, in violation of section 211.  The information alleged that the murder was committed while defendant was engaged in the commission of a robbery within the meaning of section 190.2, subdivision (a)(17).  As to all three counts, it was alleged pursuant to section 12022.53, subdivision (d), that defendant personally and intentionally discharged a firearm, causing great bodily injury and death to the victim, and that he personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c).

A jury found defendant guilty of all three counts as charged, and found true all of the special allegations.  Defendant waived his right to counsel and was permitted to represent himself in posttrial proceedings.  Defendant brought a motion for new trial, which the trial court denied.  On March 27, 2015, the court sentenced defendant to life in prison without the possibility of parole as to count 1, plus an additional 25 years to life pursuant to section 12022.53, subdivision (d).  The court imposed the upper term of five

---

[1]    See *People v. Wheeler* (1978) 22 Cal.3d 258 (Wheeler), and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

[2]    As this appeal does not present any issues related to the trial evidence, but only to pretrial and posttrial proceedings, we do not summarize the evidence presented.

[3]    All further statutory references are to the Penal Code, unless otherwise indicated.

years as to count 2, plus 25 years to life pursuant to section 12022.53, subdivision (d), and stayed the term pursuant to section 654. As to count 3, the court imposed the upper term of five years, plus 25 years to life pursuant to section 12022.53, subdivision (d), to run consecutively to the sentence on count 1. The trial court also imposed mandatory fines and fees, and direct victim restitution. Defendant was given 1,024 actual days of custody credit.

Defendant filed a timely notice of appeal from the judgment.

**Relevant peremptory challenges**

### *Prospective Juror No. 4*

Juror No. 4 stated that she was married, lived in Los Angeles, was an Army veteran, and a retired clerk for the United States Post Office. She worked as a subcontractor for a company under contract with the Transportation Security Administration (TSA). Her husband was unemployed, and her sister-in-law worked for the Los Angeles Airport Police. She had one son, who was disabled and unemployed, and two daughters, one who worked as a cosmetologist and the other as a foster parent. Juror No. 4 had been the victim in three crimes in the past: three stolen cars and an assault. Her mother and sister had been crime victims as well. Juror No. 4 had served on a civil jury and on a criminal jury about 20 years before. The criminal case was not similar to the instant case, both juries reached verdicts, and she understood the reasonable doubt standard of proof. Juror No. 4 stated that she watched crime shows on television, both real life shows and shows that were "just . . . entertainment." The several "CSI" shows she watched were entertainment, and she said that she would follow the law rather than what she saw in those shows.

When the prosecution exercised a peremptory challenge against Juror No. 4, defense counsel interposed a *Wheeler/Batson* objection and noted for the record that defendant and Juror No. 4 were both African-American. The court found that defendant had failed to make a prima facie case to support the objection, but allowed the prosecutor to state her reasons for the challenge. The prosecutor replied that Juror No. 4 worked for a contractor for the TSA, and she had concerns about postal workers, TSA employees,

and those who worked with the TSA.[4]  The prosecutor also expressed concern that Juror No. 4 watched a number of the CSI shows and other law enforcement shows, and seemed to think some of them were real.[5]  The court found a peremptory challenge against one African-American did not alone demonstrate a prima facie case of group bias, and that if a prima facie case had been made, it would find the prosecution's reasons to be race neutral and not based on a cognizable class.

Defense counsel argued that Juror No. 4 "seemed fair and impartial," that she was not employed directly by the TSA, and that most of the prospective jurors indicated that they watched CSI-type television shows.

Defense counsel observed there were no remaining African-American jurors in the jury box, and three remained in the audience.  The court noted that prospective Juror No. 7 (No. 2045) was an African-American probation officer whom he intended to excuse due to his late arrival, but offered to have him stay if defense counsel preferred.  Defense counsel acknowledged that Juror No. 7 had missed 45 minutes of voir dire, but he preferred to have him stay.[6]  The court overruled the *Wheeler/Batson* objection, reiterating that the defense had not demonstrated a prima facie case, while also finding that the prosecutor's reasons appeared to be race neutral.

---

**4**     The prosecutor added, "Similarly, I have a sort of bias against engineers, for similar reasons, sort of cutting in possibly a different direction."  Juror No. 4 did not say she or anyone she knew was an engineer.

**5**     The prosecutor was concerned with what she termed the "CSI effect."  (See generally, *Robinson v. State* (Md.Ct.App. 2014) 84 A.3d 69, 74-77.)

**6**     Juror No. 7 remained, but was soon challenged by the prosecutor, without objection by defense counsel.

*Prospective Juror No. 14*[7]

In response to the court's questioning, Juror No. 14 stated that he was married with one son, employed as an aircraft machinist, and lived in the South Bay. After he was drafted, Juror No. 14 enlisted in the Navy, but because he could not swim well, he left the service while still a recruit, and now swims well. He had served on two juries, one civil and one criminal. The charges in the criminal case were similar to those in the instant case, and the jury reached a verdict. The civil jury had deadlocked and did not reach a verdict, despite genuine effort by the jurors. He understood the court's instruction that one witness, if believed, could be enough to prove a fact, and would be able to follow that rule. Juror No. 14 stated that he had never required help from law enforcement.

Neither the prosecutor nor defense counsel questioned Juror No. 14, and he moved into the place of Juror No. 12 after another juror was excused. The prosecutor challenged him, and the defense objected. The court found a prima facie case of group bias. The prosecutor gave the court three reasons for the challenge. First, she explained that Juror No. 14 had only one son, which she thought might cause him to identify with defendant's mother, who had just one surviving son. Second, he had sat on a civil jury which had been unable to reach a verdict. The prosecutor was uncomfortable with jurors who had served on hung juries, but more so when they were civil cases, as they do not require unanimous verdicts. Third, his military service record gave her the impression that he had been a "draft dodger," because he had enlisted in the Navy to avoid the Army draft, knowing he could not swim. His statement that he now could swim appeared to her to be an open admission of his dishonesty, and she did not want to seat any juror with no shame about his dishonesty.

---

[7] Defendant refers to Juror No. 0213 in his briefs as Juror No. 12, whereas respondent refers to him as Prospective Juror No. 0213. As he was Juror No. 14 while questions were asked of him, having sat in the place of Juror No. 12 for only a moment, we refer to him as Juror No. 14.

5

Defense counsel countered that he did not interpret Juror No. 14's military experience as suggesting he was a draft dodger, because he thought that the Navy could have sent him to the Army. Counsel also argued that defendant's mother had several children, and the jury need not know that defendant was her only living son. The trial court found it "problematic" that the prosecutor had not asked any questions of Juror No. 14, and that her draft dodger conclusion was a rather complicated analysis. However, the court found the prosecutor's reasons to be race neutral, and denied the motion.

### *The empaneled jury*

During trial the court stated that that the empaneled jury included five Caucasian jurors and three African-American jurors. Defense counsel believed one of the African-American jurors might be Caucasian, but agreed that the juror could be African-American.

## DISCUSSION

## I. *Wheeler/Batson* objection

### A. *Underlying legal principals*

Defendant contends that the prosecutor improperly exercised two racially based peremptory challenges against two African-American prospective jurors, and that the trial court erred in overruling his *Wheeler/Batson* objections.

The use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias "violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).) In reviewing a *Wheeler/Batson* objection, the trial court ordinarily engages in a three-stage inquiry: the first stage requires the objecting party to make a prima facie showing of prohibited group bias; in the second stage, reached only if the objecting party has successfully made a prima facie showing, the burden shifts to the party who exercised the peremptory challenge to give a nondiscriminatory reason; and in the third stage, the court determines whether the objecting party has proven purposeful discrimination. (*People v. Silva* (2001) 25 Cal.4th

6

345, 384; *Purkett v. Elem* (1995) 514 U.S. 765, 767.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims. [Citations.]" (*Lenix, supra*, 44 Cal.4th at pp. 612-613.)

During the first stage, it is presumed that the prosecution uses its peremptory challenges in a constitutional manner. (*Wheeler, supra*, 22 Cal.3d at pp. 278-281.) To rebut that presumption and establish a prima facie case of discrimination, the moving party is required to produce sufficient evidence to show that "'the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, 170; see also *People v. Thomas* (2012) 53 Cal.4th 771, 793-794.) Only after a prima facie showing is made will the burden shift to the challenging party to articulate a race neutral reason for the challenge. (*Batson, supra*, 476 U.S. at p. 94; *Lenix, supra*, 44 Cal.4th at pp. 612-613.)

During the second stage, the race neutral reasons for the challenge must be ""clear and reasonably specific" [but] 'need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]" (*Lenix, supra*, 44 Cal.4th at p. 613, quoting *Batson, supra*, 476 U.S. at p. 98, fn. 20.)

The inquiry enters the third stage once the trial court is satisfied that a race neutral reason has been articulated; the burden then shifts back to the objecting party "to show the prosecutor excused prospective jurors for discriminatory reasons [citation], not merely that some of the nondiscriminatory reasons offered by the prosecutor are not supported by the record. In assessing the prosecutor's credibility, the trial court may, but is not required to, give weight to the fact that he or she has offered some reasons that do not withstand analysis." (*People v. Taylor* (2009) 47 Cal.4th 850, 891 (*Taylor*).)

### B. *No prima facie showing as to Juror No. 4*

Defendant argues that the trial court's error can be demonstrated with a comparative juror analysis, which would show that the reasons given by the prosecutor

for her two challenges at issue were pretexts for racial bias.  Respondent notes that a comparative analysis is not appropriate to review Juror No. 4's first-stage inquiry. "Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales." (*People v. Bonilla* (2007) 41 Cal.4th 313, 350 (*Bonilla*).)

As respondent further notes, the trial court's invitation to the prosecutor to state reasons does not now mandate a comparative analysis.  (See *People v. Taylor* (2010) 48 Cal.4th 574, 616-617.)  The California Supreme Court has "encouraged trial courts to ask prosecutors to give explanations for contested peremptory challenges, even in the absence of a prima facie showing.  [Citation.]  [I]f a court ultimately concludes that a prima facie showing has not been made, the request for and provision of explanations does not convert a first-stage *Wheeler/Batson* case into a third-stage case." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020.)

Defendant contends that the trial court *retroactively* transformed the Juror No. 4 objection into a third-stage inquiry when the court found a prima facie case as to Juror No. 14 on the ground that he was the second African-American prospective juror to be challenged.  Defendant infers this because the court stated:  "[I]n the previous *Wheeler* motion by the defense, . . . I didn't think a prima facie case had been made, because it basically revolved around a single juror; however, now that there are two African-American jurors . . . , I do think there is a prima facie case."  Defendant's inference is not reasonable.  There is nothing in the trial court's statement that can be construed as a nunc pro tunc modification of its earlier ruling that defendant had not made a prima facie showing as to Juror No. 4.  Further, the court asked only for the prosecutor's reasons for challenging Juror No. 14, and did not conduct a second-stage inquiry as to Juror No. 4.  We agree with respondent that defendant failed to make a prima facie showing as to Juror No. 4.

Defendant argues that the trial court erred by improperly basing its ruling solely on the fact that Juror No. 4 was the first African-American to be excused by the

prosecution. We disagree, as defendant's stated reasons for objecting were simply that Juror No. 4 was one of only five African-American prospective jurors, and that she seemed to defense counsel to be fair and impartial.[8]

Under such circumstances, the trial court did not err. ""'"[T]he exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.'" [Citations.]" (*Bonilla, supra*, 41 Cal.4th at p. 343, fn. omitted.) Further, a small "numerical showing alone . . . falls short of a prima facie showing [citation] because the small number of African-Americans in the jury pool makes 'drawing an inference of discrimination from this fact alone impossible.' [Citations.]" (*People v. Harris* (2013) 57 Cal.4th 804, 835.) Moreover, three remaining African-American prospective jurors were ultimately accepted by the prosecution and seated. Although this circumstance "is not conclusive, it is 'an indication of the prosecutor's good faith in exercising his peremptories.'" (*People v. Dement* (2011) 53 Cal.4th 1, 20.)

In any event, even if we agreed that defendant's objection became a third-stage inquiry, we would not undertake a comparative juror analysis. A comparative juror analysis requires the comparison of "the voir dire responses of the challenged prospective jurors with those of similar jurors who were not members of the challenged jurors' racial group, whom the prosecutor did not challenge. [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 975 (*O'Malley*).) "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step. [Citation.]" (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241; see also *Lenix, supra*, 44 Cal.4th at p. 621.)

---

**8**     Defense counsel observed that Juror No. 4 was the only African-American prospective juror in the jury box, other than Juror No. 7, who was about to be excused for cause, and only three remained in the audience. Defendant conceded that the excusal of Juror No. 7 was justified.

Where, as here, the defendant did not request a comparative juror analysis in the trial court, the reviewing court's obligation to do conduct one arises only "*when a defendant relies on such evidence and the record is adequate to permit the comparisons.* [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 662, citing *Lenix, supra*, 44 Cal.4th at p. 607, italics added.) Even then, when no comparative analysis was made in the trial court, appellate review is necessarily circumscribed, as the prosecutor did not have the opportunity to provide reasons for retaining jurors who gave answers similar to those who were challenged. (*Lenix, supra*, 44 Cal.4th at pp. 622-624.) "Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. [Citation.]" (*Id*. at p. 624; see also *Hernandez v. New York* (1991) 500 U.S. 352, 365.)[9]

A "'comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" (*Taylor, supra*, 47 Cal.4th at p. 887.) Here, defendant relies on such an exceptionally poor medium by comparing a few isolated responses, making cursory references to unnamed prospective jurors, failing to mention their other responses, what race they were, and except in the case of the alternates, whether they were challenged or ultimately seated.

---

**9** We reject defendant's contention, made without citation to authority, that the prosecutor's reasons for challenging both jurors must be reviewed de novo. We determine only whether substantial evidence supports the trial court's conclusions. (*People v. Johnson* (2015) 61 Cal.4th 734, 755.)

Defendant seeks to compare the prosecutor's reasons relating to Juror No. 4's employment and television viewing with other jurors' responses. Because the name of defendant's employer, a TSA contractor, was "Acquired Data Systems," and the prosecutor made a comment about engineers, defendant speculates that Juror No. 4's work involved the use of data systems. Defendant then observes that another (unnamed) juror stated that he worked with data systems, while another (unnamed) juror worked as a program technician, and a seated alternative juror worked in data base management. Defendant also points out that a seated juror's boyfriend worked for the TSA.

As to Juror No. 4's television viewing, defendant notes that after the prosecutor asked the prospective jurors collectively whether any of them watched crime shows such as CSI or Law and Order, she said, "I see some heads nodding, hands going up," and that she later asked the panel whether anyone else would have different answers. Again, defendant omits material details, specifically, that Juror No. 4 thought that some crime shows represented reality, and the prosecutor's stated concern about a "CSI effect." Defendant also neglects to mention that by asking for different answers, the prosecutor was referring to questions asked of Juror Nos. 1 and 4 about whether they thought DNA evidence or a video of the crime was required for proof beyond a reasonable doubt. The jurors were not asked about their belief that the shows represented reality. In any event, not only is defendant's comparison strained, he does not cite any evidence as to who the hand-raising jurors were, whether they thought some crime shows represented reality, or whether they were ultimately challenged or seated.

In sum, defendant has found a few isolated similarities in juror responses, which are without comparable context, as he has not adequately referred to other information, such as behavior, attitudes, or experiences of unchallenged jurors that might have demonstrated that race was the only material distinguishing feature of Juror No. 4. Further, defendant did not ensure that the record was adequate to permit a comparison, such as by questioning jurors who gave one or two similar answers about their attitudes or experiences, in order to determine whether they were otherwise comparable to Juror No. 4. Under such circumstances, and because defendant did not make a prima facie

11

showing as to Juror No. 4, we are not obligated to undertake such a comparison, and indeed, find it infeasible on this record.  (See *Lenix, supra*, 44 Cal.4th at p. 607.)

### C.  Juror No. 14

Despite the heading:  "Comparative juror analysis demonstrates that the race-neutral reasons stated by the prosecutor were a pretext for discrimination," defendant fails to compare Juror No. 14 to any other juror.

Regarding the prosecutor's third stated reason for excluding Juror No. 14, the inability to reach a verdict while serving on a civil jury, defendant *almost* draws a comparison with unspecified jurors.  Defendant believes that *if* the prosecutor had asked other jurors with jury experience, one or more of them *might* have reported serving on a hung jury.  Regarding the other two reasons given by the prosecutor, defendant merely finds them "ridiculous."  We thus construe defendant's arguments with regard to Juror No. 14, not as a comparative analysis, but rather as a contention that he met his third-stage burden at the *Wheeler*/*Batson* hearing to show the prosecutor excused Juror No. 14 for discriminatory reasons.  (See *Taylor, supra*, 47 Cal.4th at p. 891.)

The sole question in an appeal challenging the trial court's third-stage ruling "is whether the trial court correctly ruled that the defense did not satisfy its burden of demonstrating discriminatory motivation."  (*O'Malley, supra*, 62 Cal.4th at p. 975.)  "'At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  [Citation.]  In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.'. . .  [Citations.]"  (*People v. Johnson, supra*, 61 Cal.4th at p. 755, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339, and *Purkett v. Elem, supra*, 514 U.S. at p. 768.)  "'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'  [Citation.]  In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the

community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*Lenix, supra*, 44 Cal 4th at p. 613, fn. omitted.)

"'The proper focus of a *Batson*/*Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons . . . . All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' [Citation.]" (*O'Malley, supra*, 62 Cal.4th at p. 975.) "'[We] give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix, supra*, 44 Cal 4th at p. 614, fn. omitted.)

Defendant contends that the prosecutor's failure to ask questions of Juror No. 14 demonstrates that all her reasons to challenge him were pretextual. This is not a case where no questions were asked of the challenged juror, indeed the trial court did much of the voir dire and questioned Juror No. 14 as much as the other jurors. When defendant objected to the challenge the court noted that the prosecutor failed to ask additional questions of Juror No. 14, and found it problematic, but nevertheless believed that the reasons given were nondiscriminatory. This demonstrates that the court made a sincere and reasoned effort to evaluate the justifications offered, and we thus review the trial court's conclusions with deference. (See *Lenix, supra*, 44 Cal 4th at p. 614.)

Defendant criticizes the prosecutor's reason for challenging Juror No. 14 in part because he was unable to reach a verdict while serving on a civil jury. "Of course, the circumstance that a prospective juror has previously sat on a hung jury is a legitimate, race-neutral neutral reason for exercising a strike. [Citations.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 78.)

The two reasons that defendant challenges were: (1) that Juror No. 14 had only one son, and thus might identify with defendant's mother, who had only one surviving son; and (2) that he avoided military service by joining the Navy, then failed to learn to

13

swim until after his early discharge, suggesting dishonesty.  Defendant takes issue with the first reason because defendant's mother also had two other children.  As those children were daughters, we do not follow defendant's logic.  Neither of these justifications was implausible or fantastic, and defendant's opinion that the prospective jurors were acceptable "miscasts the inquiry."  (*People v. Hensley* (2014) 59 Cal.4th 788, 803.)  Unlike this court, the trial court was able to observe the prosecutor's demeanor as she gave explanations, as well as the juror's demeanor when he spoke about his son and when he claimed he was unable to swim as a draft-eligible young man but could swim just fine now.  We thus defer to the court's finding that the prosecutor's concern about Juror No. 14's parental empathy and his appearance of dishonesty were sincere and racially neutral reasons for the challenge.  (See *Lenix, supra*, 44 Cal.4th at p. 614.)

We conclude that substantial evidence supports the trial court's ruling.  Further, the jury ultimately included at least two, and possibly three African-American jurors.  "Although not conclusive, the fact that the jury included a member of the group allegedly discriminated against 'is an indication of good faith in exercising peremptories.' [Citation.]"  (*People v. Johnson, supra*, 61 Cal.4th at p. 760.)

## II.  Double Jeopardy

Defendant contends that the firearm enhancement of 25 years to life under section 12022.53, subdivision (d), violates principles of double jeopardy, as the same fact was also used to find murder in the first degree.  Defendant concedes that California Supreme Court authority has rejected a similar argument in *People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134, and *People v. Sloan* (2007) 42 Cal.4th 110, 115-124.  Defendant disagrees, but acknowledges that this court is bound by the decisions of the California Supreme Court.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  As defendant has raised the issue solely for the express purpose of preserving it for later review, and we must follow our high court's decisions, we reject defendant's contention without further discussion.

14

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT